No. 24-12650

IN THE

# United States Court of Appeals
# For the Eleventh Circuit

———————

**HUBERT ARTURO ACEVEDO**,
PLAINTIFF-APPELLEE,

V.

**ALEX DIAZ DE LA PORTILLA, ET AL.**,
DEFENDANTS-APPELLANTS.

———————

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-CV-20224-CIV-KMW

———————

**INITIAL BRIEF OF CITY COMMISSIONERS
ALEX DIAZ DE LA PORTILLA, JOE CAROLLO, AND MANOLO REYES**

———————

Thomas A. Tucker Ronzetti
5760 SW 46th Terrace
Miami, FL 33155
Tel: 305.546.4638

Javier A. Lopez
600 Brickell Ave., Suite 1500
Miami, FL 33131
Tel: 786.741.3177
*Counsel for Appellant Diaz de la Portilla*

Benedict P. Kuehne
100 SE 2 Street, Suite 3650
Miami, FL 33131
Tel: 305.789.5989
*Counsel for Appellant Carollo*

Frank Quintero, Jr.
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel: 305.446.0303

Jose M. Quiñon
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel: 305.858.5700
*Counsel for Appellant Reyes*

**APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellants certify the following persons and entities may have an interest in this case:

Hubert Arturo Acevedo

Linette M. Aguirre

John R. Byrne

Bryan E. Capdevila

Heaven Chee

Joe Carollo

City of Miami, Florida

Michael T. Davis

Alex Diaz de la Portilla

Johan Dos Santos

Hon. Donald L. Graham. Senior U.S. District Judge

Marcos D. Jimenez

Kevin R. Jones

Kozyak Tropin & Throckmorton, P.A.

Krinzman Huss Lubetsky Feldman & Hotte

Benedict P. Kuehne

C1 of 3

*Acevedo v. Diaz de la Portilla, 11th Circuit Case No.* 24-12650

Kuehne Davis Law, P.A.

Leon Cosgrove Jimenez, LLP

Sam T. Linn

Javier A. Lopez

Michael R. Lorigas

Chris M. McAliley, U.S. Magistrate Judge (Retired)

Maderal Byrne PLLC

Miami City Attorney's Office

Jordi Carlo Santiago Martinez-Cid

Kerri L. McNulty (Deceased)

Arthur Noriega

Stephanie K. Panoff

Mason A. Pertnoy

Jose M. Quiñon

Jose M. Quiñon, P.A.

Frank Quintero, Jr.

Quintero Broche & Fonseca-Nader, P.A.

Manolo Reyes

Thomas A. Tucker Ronzetti

Hon. Edwin G. Torres, Chief U.S. Magistrate Judge

*Acevedo v. Diaz de la Portilla, 11th Circuit Case No.* 24-12650

Tucker Ronzetti, P.A.

Hon. Kathleen M. Williams, U.S. District Judge

Vedder Price (FL), LLP

George K. Wysong

**Statement as to Corporate Ownership:**

Appellants Alex Diaz de la Portilla, Manolo Reyes, Joe Carollo, and Arthur Noriega

are individuals. Appellee Hubert Arturo Acevedo is an individual.

## STATEMENT REGARDING ORAL ARGUMENT

This is a civil-rights case by a former chief of police claiming retaliation for alleged First Amendment protected speech. First Amendment issues are difficult. *See, e.g.*, *Wollschlager v. Governor, State of Fla.*, 843 F.3d 1293, 1300 (11th Cir. 2017) (en banc) ("Despite its majestic brevity—or maybe because of it—the freedom of speech clause of the First Amendment sometimes proves difficult to apply."). Qualified immunity further compounds the complexity here. Appellant City Commissioners request oral argument to assist in the clarification of the issues.

# TABLE OF CONTENTS

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ......................................................C1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS..................................................................................... ii

TABLE OF CITATIONS .................................................................................. iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE.............................................................................4

    i.    Statement of the Facts.............................................................................4

    ii.  Course of Proceedings and Dispositions Below.............................................18

    iii.  Statement of the Standard or Scope of Review ...............................................19

SUMMARY OF THE ARGUMENT ...................................................................20

ARGUMENT .....................................................................................................24

I. ACEVEDO'S MEMORANDUM IS NOT CONSTITUTIONALLY PROTECTED.......................................................................................................25

II.    ACEVEDO'S TERMINATION AS MIAMI'S POLICE CHIEF DID NOT VIOLATE CLEARLY ESTABLISHED LAW.................................................41

III.    THE COMMISSIONERS ARE ENTITLED TO LEGISLATIVE IMMUNITY FOR ACTIONS TAKEN IN THEIR LEGISLATIVE CAPACITY.52

CONCLUSION ..................................................................................................56

CERTIFICATE OF COMPLIANCE WITH TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS..........................................................................58

CERTIFICATE OF SERVICE ...................................................................................59

iii

# TABLE OF CITATIONS

**Cases**                                                                 **Page(s)**

*Akins v. Fulton Cty.*,
  420 F.3d 1293 (11th Cir. 2005) .................................................. 31, 45

*\*Alves v. Bd. of Regents*,
  804 F.3d 1149 (11th Cir. 2015) ................................................ *passim*

*\*Ashcroft v. Al-Kidd*,
  563 U.S. 731 (2011) ...................................................................... 42

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................. 1, 51, 52

*Autrey v. Davis*,
  355 Fed. Appx. 253 (11th Cir. 2009) ................................................ 41

*Bates v. Hunt*,
  3 F.3d 374 (11th Cir. 1993) ........................................... 37, 38, 41, 47

*Batz v. City of Sebring*,
  794 Fed. Appx. 889 (11th Cir. 2019) ................................... 26, 27, 36

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 129 S. Ct. 1937 (2009) ............................................. 51

*Boyce v. Andrew*,
  510 F.3d 1333 (11th Cir. 2007) ............................... 26, 31, 32, 35, 45

*Brannon v. Finkelstein*,
  754 F.3d 1269 (11th Cir. 2014) ................................................. 47, 49

*Bryant v. Jones*,
  575 F.3d 1281 (11th Cir. 2009) ....................................................... 55

*Bryson v. City of Waycross*,
  888 F.2d 1562 (11th Cir. 1989) ................................................. 36, 37

*Busby v. City of Orlando*,

931 F.2d 764 (11th Cir. 1991) ........................................................ 47, 48

*Camp v. Corr. Med. Serv. Inc.*,
400 Fed. Appx. 519 (11th Cir. 2010) ................................................. 47

*\*Cantu v. City of Dothan, Ala.*,
974 F.3d 1217 (11th Cir. 2020) .................................................... 42, 43

*\*Carollo v. Boria*,
833 F.3d 1322 (11th Cir. 2016) ................................................. *passim*

*Carollo v. Platinum Advisors, LLC*,
319 So. 3d 686 (Fla. 3d DCA 2021) ................................................. 37

*Chesser v. Sparks*,
248 F.3d 1117 (11th Cir. 2001) .................................................... 24, 39

*Connick v. Myers*,
461 U.S. 138 (1983) .......................................................... 31, 39, 40

*Cottone v. Jenne*,
326 F.3d 1352 (11th Cir. 2003) ....................................................... 19

*\*Dartland v. Metropolitan Dade County*,
866 F.2d 1321 (11th Cir. 1989) .......................................... 39, 43, 47

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ................................................................... 42

*D'Angelo v. School Bd.*,
497 F.3d 1203 (11th Cir. 2007) .................................................. 26, 27

*Eastland v. United States Servicemen's Fund*,
421 U.S. 491, 95 S. Ct. 1813 (1975) ............................................... 55

*\*Ellis v. Coffee Cnty. Bd. of Registrars*,
981 F.2d 1185 (11th Cir. 1993) ...................................................... 53

*Executive 100, Inc. v. Martin County*,
922 F.2d 1536 (11th Cir.) ............................................................. 53

*Fernandez v. School Bd.*,
   898 F.3d 1324 (11th Cir. 2018) ........................................................ 29

*Foy v. Holston*,
   94 F.3d 1528 (11th Cir. 1996) ..................................................... 24, 49

*Fuller v. Carollo*,
   2022 WL 333234 (11th Cir. 2022) ................................................... 53

*Gaines v. Wardynski*,
   871 F.3d 1203 (11th Cir. 2017) ................................................... 42, 43

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ........................................................... 25, 27, 36

*Gomez v. City of Doral, No. 21-11093*,
   2022 WL 19201 (11th Cir. Jan. 3, 2022) ......................................... 28

*Hansen v. Soldenwagner*,
   19 F.3d 573 (11th Cir. 1994) ...................................................... 43, 49

*Harlow v. Fitzgerald*,
   457 U.S. 800, 102 S. Ct. 2727 (1982) ............................................. 53

*Harris v. Deveaux*,
   780 F.2d 911 (11th Cir. 1986) ........................................................ 53

*Hernandez v. City of Lafayette*,
   643 F.2d 1188 (5th Cir. 1981) ..................................................... 53, 55

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ....................................................................... 43

*Horsley v. Feldt*,
   304 F.3d 1125 (11th Cir. 2002) ..................................... 13, 14, 15, 16

*Hunter v. Bryant*,
   502 U.S. 224 (1991) ........................................................... 24, 43, 52

*Jackson v. Humphrey*,

vi

776 F.3d 1232 (11th Cir. 2015) ........................................................ 49

*King v. Board of County Commissioners,
916 F.3d 1339 (11th Cir. 2019) ................................................. passim

Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,
440 U.S. 391, 99 S. Ct. 1171 (1979) ............................................... 53

Lane v. Frank,
573 U.S. 228 (2014) ................................................................. 44, 45

Leslie v. Hancock County Bd. of Educ.,
720 F.3d 1338 (11th Cir. 2013) ................................................. 38, 47

Maggio v. Sipple,
211 F.3d 1346 (11th Cir. 2000) ...................................... 31-32, 43, 47

Malley v. Briggs,
475 U.S. 335 (1986) ...................................................................... 43

Martin v. Baugh,
141 F.3d 1417 (11th Cir. 1998) ....................................................... 43

*Mitchell v. Forsyth,
472 U.S. 511 (1985) ...................................................... 1, 24, 52, 53

Morales v. Stierheim,
848 F.2d 1145 (11th Cir. 1988) ................................................. 36, 40

Morgan v. Ford,
6 F.3d 750 (11th Cir. 1993) ...................................................... 31, 32

Moss v. City of Pembroke Pines,
782 F.3d 613 (11th Cir. 2015) .............................................. 25, 27, 36

Mt. Healthy City Sch. Dist. v. Doyle,
429 U.S. 274 (1977) ...................................................................... 49

Oladeinde v. City of Birmingham,
230 F.3d 1275 (11th Cir. 2000) ................................................. 40-41

*O'Boyle v. Sweetapple*,
   187 F. Supp. 3d 1365 (S.D. Fla. 2016) .............................................................. 55

*Phillips v. City of Dawsonville*,
   499 F.3d 1239 (11th Cir. 2007) ..................................................................... 29, 45

*\*Pickering v. Board of Education*,
   391 U.S. 563 (1968) ....................................................................................... 26, 36

*Randall v. Scott*,
   610 F.3d 701 (11th Cir. 2010) ............................................................................ 51

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ........................................................................................... 37

*Scott v. Taylor*,
   405 F.3d 1251 (11th Cir. 2005) ......................................................................... 53

*Shahar v. Bowers*,
   114 F.3d 1097 (11th Cir. 1997) ......................................................................... 38

*Stanley v. City of Dalton*,
   219 F.3d 1280 (11th Cir. 2000) ..................................................................... 47, 49

*Stimpson v City of Tuscaloosa*,
   186 F.3d 1328 (11th Cir. 1999) ..................................................................... 49, 51

*\*Supreme Court of Virginia v. Consumers Union of the United States*,
   446 U.S. 719, 100 S. Ct. 1967 (1980) ........................................................... 23, 56

*Tenney v. Brandhove*,
   341 U.S. 367, 71 S. Ct. 783 (1951) ................................................................... 53

*Tower v. Glover*,
   467 U.S. 914, 104 S. Ct. 2820 (1984) ............................................................... 53

*Villa v. Padròn*,
   494 F.3d 1334 (11th Cir. 2007) ......................................................................... 45

*Walker v. Schwabe*,

112 F.3d 1127 (11th Cir. 1997) ........................................................ 45

*Wall-Desousa v. Florida Dep't of Highway Safety*,

    691 Fed. Appx. 584 (11th Cir. 2017) ........................................ 49, 52

*White v. Pauly*,

    580 U.S. 73, 137 S. Ct. 548 (2017) ........................................... 42, 44

*Williams v. City of Atlanta*,

    618 Fed. Appx. 957 (11th Cir. 2015) .............................................. 26

*Wollschlager v. Governor, State of Fla.*,

    843 F.3d 1293 (11th Cir. 2017) (en banc) .......................................... i

## Statutes

28 U.S.C. § 1331 ............................................................................ 1
28 U.S.C. § 1367 ............................................................................ 1
42 U.S.C. § 1983 .........................................................................1, 4

## Rules

Federal Rules of Appellate Procedure
      Rule 27 ................................................................................ 58
      Rule 32 ................................................................................ 58
Eleventh Circuit Rules
      Rule 26.1-1 ............................................................................ 1

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction based on federal questions presented under 42 U.S.C. § 1983 and supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1367(a).

Pursuant to the collateral order doctrine, this Court has jurisdiction over the appeal from the district court's dismissal order (Doc. 75), which denied Appellants qualified and legislative immunity for claims of First Amendment retaliation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Carollo v. Boria*, 833 F.3d 1322, 1327-28 (11th Cir. 2016).

## STATEMENT OF THE ISSUES

1.      Whether a police chief, the city's highest law enforcement officer and manager of its police department, spoke as a private citizen under the First Amendment when he provided a memorandum signed by him as "Chief of Police-Miami Police Department" to his superiors, the city manager and mayor, criticizing commissioners whom he claimed committed misconduct by interfering with his management of the police force, and copied an outside law enforcement agency, while a city resolution appointed the manager to direct investigations of the commissioners to be handled by another agency.

2.      Whether a police chief spoke on a matter of public concern under the First Amendment when he issued a memorandum that purportedly confirmed his previous reports of commissioners' alleged misconduct to his superiors, the city manager and mayor; identified interference with his management of the police force; signed it as "Chief of Police"; and provided it in the midst of his ongoing disputes with the city commission.

3.      Whether under the *Pickering* balancing test a city commission may terminate a police chief who—fulfilling a policymaking function and charged with promulgating all orders, rules, and regulations for the governance of the police force—challenged the commission's budget decisions as "interference" and displayed open defiance that would risk disruption of the municipal police force.

4.    Whether law in this circuit clearly establishes that the police chief engaged in conduct protected by the First Amendment.

5.    Whether the *Pickering* balancing test leads to the inevitable conclusion that the police chief could not be terminated from his role in harmony with the First Amendment.

6.    Whether the record fails to establish the three defendant city commissioners' sole motive was retaliation against the police chief for his memorandum, where the police chief was terminated after a public hearing with witnesses based on a charging Suspension Memorandum identifying eight bases for his termination; he was terminated by unanimous vote of all five members of the city commission, two of whom are not alleged to have any illegal motive; and he has not alleged how any basis of his termination is pretextual.

7.    Whether the city commissioners are entitled to legislative immunity for actions taken solely in their legislative capacity.

## STATEMENT OF THE CASE

Plaintiff-Appellee Hubert Arturo Acevedo ("Police Chief Acevedo" or "Acevedo") claims a civil rights violation under 42 U.S.C. § 1983, asserting one count (Count II)[1]against the City of Miami and three of five City Commissioners (Alex Diaz de la Portilla, Joe Carollo, and Manolo Reyes ("Appellant City Commissioners")), and City Manager Arthur Noriega ("Noriega"), alleging retaliation based on the exercise of free speech under the First Amendment. *See* Doc. 1 at 36-35, ¶¶ 251-312.[2] According to the Complaint, Acevedo's First Amendment rights were violated when he was terminated by all five members of the City Commission, including two not named as defendants, in retaliation for his memorandum accusing the three Appellant City Commissioners of conduct that interfered with police department operations.

### i.    Statement of the Facts

### A.    The City of Miami and Its Police Department

The City of Miami ("Miami" or the "City") is a municipality of the State of Florida. Doc. 1 at 2, ¶ 9. The City Commission (the "Commission") is "the governing

---

[1] The Complaint's remaining count (Count I) is a state-law statutory "whistleblower" claim asserted only against the City of Miami.

[2] Record references "Doc." are to the document number of the district court clerk's docket, and where applicable, "at" and then the specific page number of the document, also with paragraph numbers given for citations to the Complaint.

4

body" of the City, with the power to "exercise all powers conferred upon the city" except those specifically limited. City of Miami Charter § 4(a). The Commission specifically has the power to "investigate the financial transactions of any office or department of the city government and the official acts and conduct of any city official, and by similar investigations may secure information upon any matter." *Id.* § 14.

The City Manager is the head of the administrative branch of the City's government. City Charter § 15. The City Manager has control of all City departments. *Id.* § 16(c). The Commission does not have the power to give orders to subordinates of the City Manager. Doc. 1 at 4, ¶ 25 (quoting City Charter § 4(d)). The Commission does, however, have "the sole authority and responsibility" to decide to terminate the police chief and to make policy determinations regarding that termination once the City Manager suspends the police chief. *Id.* at 48, ¶¶ 326-28 (citing City Charter § 26).

The duties of the police chief are defined in the City of Miami Charter. Doc. 1 at 4, ¶ 19. Pursuant to Section 24 of the Charter, the Police Chief has the "immediate direction and control of the police force" and, through the Police Chief, the Director of Public Safety shall "promulgate all orders, rules and regulations for the government of the police force." *Id.* ¶ 20. Pursuant to City of Miami Code § 42-3, the Police Chief, as director of the Miami Police Department, is "charged with

5

responsibilities for the prevention, control and suppression of crime in the city."

On February 13, 2020, more than a year before Acevedo was recruited as police chief, the City Commission passed Resolution No. R-20-0034 (the "Resolution"). Doc. 1 at 5, ¶ 28. The Resolution states (with emphasis supplied):

> WHEREAS, the need for criminal *investigations* into elected officials of the City of Miami ("City") or of their present and former personnel occasionally arises; and
>
> WHEREAS, the handling of such *investigations* by the Miami Police Department may create the perception of a conflict or impropriety; and
>
> WHEREAS, the Miami City Commission desires that any such *investigations* proceed in a transparent manner, free from potential perceived conflicts; …
>
> …
>
> NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:
>
> …
>
> Section 2. The City Commission hereby directs the City Manager to take any all necessary steps to develop a memorandum of understanding ("MOU") with the Florida Department of Law Enforcement ("FDLE") and/or the Federal Bureau of Investigation ("FBI") to direct all criminal *investigations*, excluding those relating to misdemeanors or traffic offenses, of City elected officials and their present and former (within the past two (2) years) personnel to FDLE and/or the FBI, as appropriate, for *investigation* in order to avoid any perceived conflicts in any such processes.
>
> …
>
> Section 4. In the interim, until the MOU is approved by the City

6

> Commission, the City Commission hereby directs the City Manager to forward any and all pending criminal *investigations*, excluding those relating to misdemeanors or traffic offenses, of City elected officials and their present and former (within the past two (2) years) personnel to FDLE and/or the FBI.

Doc 41-1 at 1-2. The Resolution "purportedly shifted the duty and responsibility of *investigating* City of Miami elected officials from the MPD to either the FDLE or the FBI." Doc. 1 at 5, ¶ 32 (emphasis added). The Resolution does not, however, forbid anyone from *reporting* wrongdoing, and Acevedo's Complaint does not allege it did.

### B.      Acevedo's Six-Month Tenure as Police Chief

Acevedo was sworn in as the City's Chief of Police on April 5, 2021. Doc. 1 at 3, ¶ 18.

### *Commissioner Diaz de la Portilla*

According to the Complaint, during Acevedo's tenure, Commissioner Diaz de la Portilla interfered with his police chief duties. Doc. 1 at 6, ¶ 36. During an April 22, 2021 meeting of the City Commission, Diaz de la Portilla recommended that the Miami Police Department (the "MPD") investigate certain bars and establishments for alleged criminal activities. *Id*. at 9, ¶¶ 56, 64. The next day, his assistant emailed Manager Noriega, copying Acevedo, a list of ten establishments that Diaz de la Portilla would like investigated for "allegedly engaging in illegal activity." *Id*. at 10, ¶¶ 65-67.

Commissioner Diaz de la Portilla also allegedly interfered with an MPD investigation into MPD Officer Luis Camacho, who served as sergeant-at-arms for Miami Mayor Francis Suarez. Doc. 1 at 14, ¶¶ 100-06. Based on the investigation, Officer Camacho was relieved of duty on June 22, 2021. *Id.* ¶ 107. Two days later, the City Commission held a meeting which discussed a pocket item proposed by Diaz de la Portilla concerning Officer Camacho. *Id.* ¶¶ 108-11. Diaz de la Portilla expressed concern that the MPD's investigation of Officer Camacho was deficient, *id.* at 15, ¶ 113; commented on how the investigation tarnished Officer Camacho's reputation, *id.* at 16, ¶ 118; and spoke privately with Acevedo on the matter, *id.* ¶¶ 119-120. Acevedo alleges Diaz de la Portilla offered to support him running for Miami-Dade Sheriff if he reinstated Officer Camacho. *Id.* at 17, ¶¶ 122-23.

The Complaint also alleges that Diaz de la Portilla interfered with Acevedo's duties by voting to eliminate funding for two MPD positions. On September 13, 2021, the City Commission voted to eliminate funding for the Deputy Chief and Deputy Director of Constitutional Policing positions. Doc. 1 at 20-21, ¶¶ 152-63.

### *Commissioner Reyes*

Acevedo also alleges that Commissioner Reyes' actions during city commission and budget meetings interfered with Acevedo's police chief duties. According to the Complaint, during Acevedo's tenure, Commissioner Reyes allegedly interfered with an MPD internal investigation into Officer Camacho. Doc.

1 at 14-16, ¶¶ 107-118. The Complaint alleges that during a June 24, 2021 Commission hearing, Commissioner Reyes, acting within the parameters of his discretionary authority under the City Charter, agreed with Commissioners Diaz de la Portilla and Carollo's inquiries concerning the investigation of Officer Camacho. *See id.* at 15-16, ¶¶ 113-117. Specifically, Commissioner Reyes responded to Commissioner Diaz de la Portilla's statements: "The only thing I have to add is 'Amen.' The only thing I have to add is I feel the same way and keep on sir.*" Id.* at 15, ¶ 114. After Commissioner Carollo expressed his concerns with Officer Camacho's investigation, Commissioner Reyes stated: "I support what Commissioner Carollo says about Sergeant Camacho, and I am also not happy about it.*" Id.* at 16, ¶ 117.

The Complaint further alleges that Commissioner Reyes interfered with Acevedo's duties by voting to eliminate funding for two positions in the MPD during a budget meeting on September 13, 2021. Doc. 1 at 20-1, ¶¶ 152-63. The unanimous Commission voted to eliminate these positions. *Id.* at 21, ¶¶ 157, 163. Eleven days later, on September 24, 2021, Chief Acevedo sent his Memorandum.

Neither the Complaint nor the September 24, 2021 Memorandum allege that Reyes weaponized any City resources. These actions by Commissioner Reyes — actions undertaken from the dais during public commission meetings and permitted by the City of Miami Charter — are the subject of Chief Acevedo's September 24,

9

2021 Memorandum, which communication Chief Acevedo alleges is protected by the First Amendment. Doc. 1 at 23, ¶ 178.

### *Commissioner Carollo*

Acevedo asserts that shortly after he was sworn in as Chief of Police, City of Miami officials, including Mayor Suarez, City Manager Noriega, and Commissioner Diaz de la Portilla, commented that Commissioner Carollo did not like a man named William Fuller, a business owner in the City, and that Commissioner Carollo's dislike was due to Fuller's support of Carollo's political opponent. Doc. 1 at 7-8, ¶¶ 40, 43-46. Acevedo was told to "stay away" from Fuller's businesses. Doc. 1 at 8, ¶ 46. Otherwise, Commissioner Carollo "would go crazy." Doc. at 8, ¶¶ 48-49.

On April 3, 2021, two days before Acevedo was sworn in as chief of police, he was summoned by City Manager Noriega to Taquerias, a Fuller-owned business, where he met with Noriega who was looking into possible "violations" by Taquerias. Doc. 1 at 8, ¶ 53. Noriega explained that he was taking this action at the direction of Commissioner Carollo, who had an "absolute disdain" for Fuller. Doc. 1 at 9, ¶ 55. Then, at an April 22, 2021 City Commission meeting, Commissioner Carollo introduced a "pocket item" with the intended goal of "tightening up" Code Enforcement and MPD procedures regarding alcohol enforcement, establishing an "operational task force to combat criminal activities pertaining to narcotics, prostitution, human trafficking, and illegal gambling," Doc. 1 at 9, ¶¶ 58-59. Carollo

10

asked the manager for permission to give Acevedo "a specific list of places for the police to investigate." Doc. 1 at 9, ¶ 62. The manager approved. *Id.* ¶ 63. The Complaint alleges the lists provided by Carollo and produced by Diaz de la Portilla were not supported by evidence of criminal activity. Doc. 1 at 10, ¶ 68.

The Complaint also alleges Commissioner Carollo's "focus remained almost exclusively on Fuller-owned businesses." Doc. 1 at 12, ¶ 81. Carollo claimed Fuller was bribing code enforcement officials and police officers, despite Acevedo having no supporting information. Doc 1 at 12, ¶¶ 82-84.

Carollo also demanded on multiple occasions that Acevedo arrest "agitators" attending public events. Doc. 1 at 12, ¶¶85-88. Carollo told Acevedo in June and July 2021, about arresting agitators, who he described as communists, but Acevedo was unaware of any violations. Doc. 1 at 12-13, ¶¶ 87-98.

Acevedo alleges that on June 24, 2021, the Commission held a meeting where the Commissioners, including Carollo, chastised him about the Officer Camacho investigation. Doc. 1 at 14-16, ¶¶ 108-120. Carollo and other commissioners met privately with Acevedo to ask about the investigation. Doc. 1 at 16, ¶¶ 119-120.

The Complaint additionally alleges that at a September 13, 2021 commission meeting, Commissioner Carollo moved to eliminate funding for the Deputy Chief position. Doc. 1 at 21, ¶ 154. The Commission unanimously approved defunding that position and the Deputy Director of Constitutional Policing. Doc. 1 at 21 ¶¶ 157,

161, 163-164.

On September 23, 2021, during a Commission meeting, City Manager Noriega met with Acevedo to tell him not to transfer Officer Blanco, whom Acevedo had transferred from a field position to an internal affairs position, or else Carollo would "blow up [Acevedo's] budget further." Doc. 1 at 23, ¶ 173.

### C.    Acevedo's September 24, 2021 Memorandum

Three days before the Commission was scheduled to discuss the police chief, Acevedo sent a memorandum (the "Memorandum") addressed to his superiors, City Manager Noriega and Mayor Suarez:

**MEMORANDUM**

TO:    MANAGER ROGER NORIEGA
          MAYOR FRANCIS SUAREZ

FROM:    CHIEF ART ACEVEDO

SUBJECT:    RECENT ACTIVITIES BY CITY OFFICIALS

DATE:    SEPTEMBER 24, 2021

This memorandum is to confirm my recent disclosures in prior meetings with you and to provide additional disclosures to you in your leadership capacities with the City of Miami (City).

As you know, on April 5, 2021, I was sworn in as Chief of Police of the Miami Police Department (MPD). I came to Miami via the City of Houston, TX, Police Department after being recruited by you as the Mayor and City Manager. Both of you indicated there was a need to reform the MPD and to change the culture of the agency.

Early on in my tenure I learned the task of reforming the department would be arduous and the resistance to change from some in the department, including the FOP (MPD police union), and others, was intense. Despite this challenge, I have quickly come to love the spirit of the majority of the hard-working men and women of MPD, both sworn and support personnel. Unfortunately, certain City commissioners have interfered with the reform efforts and have interfered with a confidential internal investigation.

12

Doc 17-3 at 1, Doc. 25-1 at 2.[3] Acevedo also provided it to the FBI and the State Attorney. Doc. 1 at 23, 25, ¶¶ 177, 187. The Memorandum states Acevedo provided it "to confirm [his] recent reports . . . of misconduct of certain City Commissioners and to disclose additional misconduct to [them] in [their] leadership capacities with the City of Miami[.]" Doc 17-3, at 1. Acevedo signed the Memorandum in his capacity as Chief of Police:

With Great Respect and Heavy Heart,

Art Acevedo
Chief of Police
Miami Police Department

*Id.* at 8.

The Memorandum sets forth three sections, each claiming "interference" by the Appellant City Commissioners: (1) "Interference with MPD Internal Affairs Division (IAD) investigation"; (2) "Interference with Reform Efforts and MPD Staffing"; and (3) "Interference with and Improper Use of MPD Resources." Doc. 17-3 at 1-8. As to Commissioners Diaz De La Portilla and Carollo, much of these allegations of "interference" – and as to Commissioner Reyes, *all* of them – describe

---

[3] Although the Complaint did not attach the Memorandum, Commissioner Diaz de la Portilla requested its use based on the "incorporation by reference" doctrine. Doc. 24 at 2 n. 1 (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002)). Acevedo made no objection, and the Memorandum subsequently featured both in Acevedo's responsive papers, Doc. 37 at 8-9 (citing Doc. 17, Ex. C), and the District Court's Order. Doc. 75 at 16-17 (citing Doc. 25-1).

conduct of the Appellant City Commissioners at public hearings. *Id.* at 1-3 (describing statements at a June 24, 2021, hearing); 5-6 (describing statements at a Sept. 13, 2021 budget meeting).

The Memorandum's first section, entitled "Interference with MPD Internal Affairs Division (IAD) investigation," discusses Acevedo's complaints that city commissioners interfered with the MPD's internal investigation of Luis Camacho, a member of the Sergeant-At-Arms Detail. Doc. 17-3 at 1. Nearly the entire section discusses public remarks made by commissioners during a commission meeting, which Acevedo concluded were "improper efforts to influence the IAD investigation and reverse MDP personnel decisions." *Id.* at 3. The final paragraph discusses "the arrest of Frank Pichel for impersonating a law enforcement officer." *Id.* at 4. The Memorandum states that Acevedo "understand[s] that Pichel works or has worked as a Private Investigator gathering 'dirt' for Commissioner Carollo and other elected officials." *Id.* Acevedo noted he had called the Mayor Suarez and Manager Noriega to advise them he intended to request assistance from the FBI and U.S. Department of Justice. *Id.*

The Memorandum's second section, entitled "Interference with Reform Efforts and MPD Staffing," discusses how Acevedo hired Heather R. Morris as a deputy chief. Doc. 17-3 at 4. The Commission, however, eliminated her position. *Id.* Much of the remainder of this section criticizes the City Commission's budget

14

decision and public statements made by Commissioner Carollo during a budget meeting. *Id.* at 4-6. Acevedo explained he had uncovered "a pattern of unlawful use of force by officers" but "Commissioners Carollo, Reyes and Diaz de la Portilla manipulated the budget process to hamper [his] reform by eliminating the funding . . ." *Id.* at 6. He also claimed the Commissioners "threatened to fire the City Manager if he does not do their bidding," attempted to interfere with an investigation, and attempted (per a conversation with the Manager) to prevent the transfer of "someone named Blanco into internal affairs." *Id.* at 6-7.

The third and final section, entitled "Interference With and Improper Use of MPD Resources," points out occasions when commissioners asked the police to perform investigations. Doc. 17-3 at 7-8. The Memorandum alleges Commissioner Carollo complained of "agitators" at a Calle Ocho event on June 25, 2021, and corruption by City Code Enforcement. *Id.* at 7. Acevedo also wrote that "Carollo and Diaz de le Portilla provided the MPD with a target list of establishments which *they* claim are engaged in criminal activity and have pointed the finger at establishments in each other's districts, causing the MPD to investigate establishments based on nothing more that the whims of Commissioners Carollo and Diaz de la Portilla." *Id.* at 7 (emphasis in original).

Acevedo alleges that, following his Memorandum, during a September 27, 2021 special meeting, the Appellant City Commissioners "launched a series of ad

15

hominem character attacks on" him. Doc. 1 at 25, ¶ 190. The Complaint does not

directly attribute any attacks to Diaz de la Portilla or Reyes, but instead focuses on

official statements by Commissioner Carollo and videos played by the

Commissioners at the public hearing. *See* Doc. 1 at 26-25, ¶¶ 190-98. The City

Commission voted in favor of an independent investigation of the allegations in

Acevedo's Memorandum. *Id*. at 26-27, ¶¶ 199-200.

**D.    The Suspension Memorandum & Acevedo's Termination**

Following the September 27 special meeting, on October 11, 2021, City

Manager Noriega suspended Acevedo and provided him a "Suspension

Memorandum" outlining his reasons for the suspension. Doc. 1 at 28, ¶ 212. The

Suspension Memorandum[4] stated the reasons for Acevedo's suspension within six

months of his appointment:

- losing the confidence of the rank-and-file officers due to threats and verbal assaults;

- using offensive language with a civilian during a protest;

---

[4] In his Complaint, Acevedo discusses the Suspension Memorandum which resulted in the employment termination that forms his claims. Doc. 1 at 28-29, ¶¶ 212-16. Like Acevedo's Memorandum, the Suspension Memorandum was appropriately raised in the motion to dismiss based on the "incorporation by reference" doctrine. *See Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (permitting the court to consider a document attached to a motion to dismiss when that document is (1) central to the plaintiff's claim and (2) its authenticity is not challenged). Pursuant to Section 26 of the City Charter, the Suspension Memorandum provides the "charges" against Acevedo, is legally integral to the termination for which he seeks relief and therefore is central to his claim. Below, Acevedo did not challenge the Suspension Memorandum's use. *See* Doc. 37 at 17-18.

- making a "Cuban Mafia" comment to departmental staff;

- failing timely to report damage to his vehicle as required by protocols, while terminating subordinates for protocol violations;

- failing to report personal/vacation time;

- disobeying the city manager by making an unauthorized employment offer to a former colleague; and

- failing to provide an adequate action plan as requested by the city manager.

*See* Doc. 1 at 28-30, ¶¶ 212-20, 226 & Doc. 24-1 at 2-3. Acevedo alleges in conclusory fashion, without factual support or explanation, that the Suspension Memorandum's reasons are pretextual, and he was actually suspended in retaliation for sending his Memorandum. Doc. 1 at 28, ¶ 213-14.

Section 26 of the City Charter requires that, following the City Manager certifying the fact and cause of the police chief's suspension, the Commission must hear the charges within five days and render its judgment. City of Miami Charter § 26. Noriega set Acevedo's termination hearing to occur two days after his certification, on October 13, 2021. Doc. 1 at 29, ¶ 218. Acevedo requested that the hearing be reset for October 18, 2021. *Id.* The Manager then rescheduled the termination hearing for October 14, 2021. *Id.*

Acevedo's termination hearing then proceeded. Doc. 1 at 29, ¶ 219. All five members of the City Commission attended the hearing, *id.* at 30, ¶ 226, which

17

Acevedo concedes was a quasi-judicial proceeding, *see id.* at 29, ¶ 221. During the hearing, counsel for City Manager Noriega presented evidence through four witnesses, including himself. *Id.* ¶ 220. Acevedo was represented by counsel. *See id.* at 30, ¶ 223. At the hearing's conclusion, all five members of the City Commission unanimously voted to terminate Acevedo. *Id.* ¶ 226.

Acevedo does not contest the evidence presented by the City at his termination hearing. Although he complains that Appellant City Commissioners exhibited bias, Doc. 1 at 29, ¶ 221, he does not allege that he requested that they be recused. Acevedo alleges that after his counsel rested his case, Commissioner Diaz de la Portilla said, "I rest mine." Doc. 1 at 30, ¶ 223. City Commissioner Ken Russell, who is not a defendant or subject to Acevedo's allegations of bias, admonished Commissioner Diaz de la Portilla for that comment. *See id.* ¶ 224. Commissioner Russell nonetheless voted in favor of terminating Acevedo. *See id.* ¶ 226.

Acevedo never challenged the City Commission's judgment in any state tribunal but instead proceeded with this federal case.

## ii.   Course of Proceedings and Dispositions Below

Acevedo filed his two-count Complaint on January 19, 2022. Doc. 1. All Defendants moved to dismiss. Docs. 17, 23, 24, 25, 27. Each individual Defendant asserted qualified immunity as a basis for dismissal, and Appellant City Commissioners also invoked legislative immunity. Docs. 23-25, 27, 54. Acevedo

responded, Doc. 36-39, and the Defendants filed a Consolidated Reply, Doc. 54.

On motion, the District Court stayed all discovery pending resolution of the individual Defendants' qualified immunity defense. Docs. 33, 34. Appellant City Commissioner Diaz de la Portilla moved for judicial notice of City of Miami Resolution R-20-0034, Doc. 41, and the District Court granted that motion, Doc. 47.

The District Court held a hearing on the Motions to Dismiss on October 13, 2022. Doc. 59. On July 29, 2024, the District Court issued its Order denying all Motions to Dismiss. Doc. 75. The individual Defendants subsequently timely filed notices of appeal, with the last filed on August 28, 2024. Docs. 80, 88, 91, 92.

The individual Defendants moved for a stay pending this appeal based on their qualified immunity. Doc. 99. The District Court granted that motion in part and denied it in part, allowing document discovery from the City while the individual Defendants' interlocutory appeals are pending. Doc. 109.

### iii.    <u>Statement of the Standard or Scope of Review</u>

The Court reviews *de novo* the denial of qualified and legislative immunity and the determination of whether a complaint sufficiently alleges a constitutional violation. *Carollo*, 833 F.3d at 1328. In reviewing a complaint, the Court "accept[s] all well-pleaded factual allegations as true and construe[s] the facts in the light most favorable to the plaintiff." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003), *quoted in Carollo*, 833 F.3d at 1328.

## SUMMARY OF THE ARGUMENT

Acevedo is claiming First Amendment retaliation in his termination by the Miami City Commission, suing three of its five commissioners, its city manager, and the City of Miami itself. He contends this retaliation resulted from a September 24, 2021 memorandum (the "Memorandum") he sent to his direct superior, the city manager, labeled with headings regarding "Interference" and complaining about interference with the management of the city's police department, which at times he characterizes as corruption. *See* Doc. 25-1 at 2, 5, 7. Because Acevedo copied other law enforcement officials and the City of Miami has a Resolution directing investigations, but not reporting, of commissioners to the Florida Department of Law Enforcement, Acevedo contends he acted as a private citizen, the Memorandum is protected by the First Amendment, and his firing violated the Constitution and clearly established law, defeating the qualified immunity. That is incorrect as a matter of law.

Acevedo's September 24 Memorandum does not constitute protected First Amendment activity because he was not acting as a private citizen. As chief of police, and Miami's highest law enforcement official, Chief Acevedo was responsible for the "immediate direction and control of the police force," as stated in Section 24 of the City of Miami Charter. He sent the Memorandum to his superiors the city manager and mayor, signed it as Chief of Police, and referred to his "sworn

20

duty" to provide it. The Memorandum is literally labeled with headings about "Interference," and it complained about interference with the management of the police department. *See* Doc. 25-1 at 2, 5, 7. The Memorandum's main thrust addressed interference with Acevedo's management, and he wrote it as a police chief.

Even if the Memorandum's main thrust was to report corruption, however, it would fall within Acevedo's duties as a police chief, and so it is not the act of a private citizen. Below, Acevedo argued that he became a private citizen, claiming that City Resolution No. 20-0034 stripped him of his duty to report commissioners. Nothing in that Resolution, however, bars the City's police chief from *reporting* possible wrongdoing. The conclusion that the police chief was somehow gagged from even reporting corruption conflicts with his broad responsibilities and simply makes no sense. On the other hand, it makes complete sense that Acevedo had the duty to report as he did so the City Manager could then act. The Memorandum owes its existence to Acevedo's professional responsibilities and so is not protected.

Acevedo's Memorandum is also not protected because it did not raise an issue with the public but instead addressed Acevedo's own concerns. The content, form, and context of the Memorandum show that Acevedo wanted to protect his own interests in his job. Acevedo wrote the Memorandum as a report to his superiors to complain about interference by the Commissioners in his management, and he

21

provided it the midst of disputes he had with them aired out in public meetings where the Commissioners, his ultimate superiors, were openly critical.

Even if Acevedo's Memorandum was protected by the First Amendment, Chief Acevedo cannot prevail in the *Pickering* balancing test. As chief of police, he held a policymaking role, and for such government employees, constitutional protection is slight. The City Commission was entitled to terminate Acevedo's employment due to his policy disputes, regardless of his claims of whistleblowing.

Beyond these arguments, the Commissioners are entitled to qualified immunity. Neither the Supreme Court nor the Eleventh Circuit has ruled that a police chief who reports interference and corruption to his superior while copying outside authorities is entitled to First Amendment protection. Acevedo relied on cases such as *Carollo v. Boria*, 833 F.3d 1322 (11th Cir. 2016), where the plaintiff's ordinary job duties "did not include anything to do with" his speech activity. As chief of police, Acevedo's responsibilities had everything to do with managing the police force and reporting possible crimes. In contending his First Amendment rights are clearly established for "whistleblowers," Acevedo commits the error of defining the law at too high a level of generality. The question instead is whether *in this context* the Commissioners should have known Chief Acevedo engaged in First Amendment protected conduct based on clearly established law. Regarding *Pickering* balancing, the test is still more demanding: the Court must come to the inevitable conclusion

that the discharge of the employee was unlawful. Acevedo cannot satisfy that test here, where he had a policymaking role and yet disputed the elected Commissioners' policy decisions.

Qualified Immunity also protects the Commissioners because the record establishes their legitimate motivation in terminating Acevedo. Acevedo was terminated following a public hearing with witnesses based upon a Suspension Memorandum charging his shortcomings. All five City Commissioners voted to terminate his employment based on that record, including two whose motivations Acevedo does not question, and a third, Commissioner Reyes, for whom Acevedo did not identify any actionable misconduct. On that record, Acevedo does not plausibly allege the Appellant City Commissioners' sole motive was to retaliate against him for his Memorandum. Appellant Commissioners are therefore entitled to qualified immunity.

Actions by the Appellant City Commissioners in their legislative capacity are also protected by absolute immunity from suit and liability as is necessary "to insure that the legislative function may be performed independently without fear of outside interference." *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731, 100 S. Ct. 1967 (1980). Legislative immunity extends to all portions of the Complaint encompassing legislative and policy matters, and all commentary made during and in connection with City Commission meetings.

Qualified and legislative immunity shield the Appellant Commissioners from Acevedo's First Amendment retaliation claims. Therefore, the district court's dismissal order should be reversed.

## **ARGUMENT**

Qualified immunity "protects government actors performing discretionary functions from being sued in their individual capacities." *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). "Claims for money damages against government officials in their individual capacity involve substantial costs not only for the individual official – who incidentally may be innocent – but for society in general." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). Qualified immunity should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To receive qualified immunity, a public official must first show he was acting within his discretionary authority when the allegedly wrongful act occurred. *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016). The burden then shifts to the plaintiff to show qualified immunity is not appropriate. *Id.*

Here, "Plaintiff does not dispute that the individual Commissioner Defendants

24

were acting within their discretionary authority." Doc. 75 at 28. Acevedo thus has the burden to defeat qualified immunity by establishing that "(1) his complaint pleads a plausible claim that the defendants violated his federal rights (the 'merits' prong), and that (2) precedent in this Circuit at the time of the alleged violation 'clearly established' those rights (the 'immunity' prong)." *Carollo*, 833 F.3d at 1328.

Acevedo cannot satisfy either prong. His Complaint fails to establish a First Amendment violation because his Memorandum is not constitutionally protected, and the violation he alleges is not clearly established by binding law.

## I.    ACEVEDO'S MEMORANDUM IS NOT CONSTITUTIONALLY PROTECTED.

The Supreme Court has provided a two-step inquiry regarding whether a government employee's speech is constitutionally protected, and "[b]oth steps are questions of law for the court to decide." *Alves v. Bd. of Regents*, 804 F.3d 1149, 1159 (11th Cir. 2015) (discussing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2005).

The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *Garcetti*, 547

25

U.S. at 418 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)).

Acevedo cannot establish either step.

## A.    Police Chief Acevedo's Memorandum is Not Speech as a Citizen on a Matter of Public Concern.

For a government employee's speech to be protected, he "must have spoken (1) as a citizen and (2) on a matter of public concern." *Alves*, 804 F.3d at 1160. Acevedo cannot satisfy either prong.

### 1.    The Memorandum is Not the Act of a Private Citizen.

a.    The Memorandum Arose from Acevedo's Duties as Police Chief.

Acevedo's Memorandum is a report about interference in his management of the MPD. A government employee does not speak as a citizen when, like Acevedo, he complains about interference with the operation of his department. *Batz v. City of Sebring*, 794 Fed. Appx. 889 (11th Cir. 2019); *King v. Board of County Commissioners*, 916 F.3d 1339, 1347 (11th Cir. 2019); *Alves*, 804 F.3d at 1165 ("reporting conduct that interfered with their ordinary job duties" constitutes speaking as an employee, not protected by the First Amendment); *Boyce v. Andrew*, 510 F.3d 1333, 1345-46 (11th Cir. 2007) (similar; discussed in *Alves*). *See also Williams v. City of Atlanta*, 618 Fed. Appx. 957, 958-959 (11th Cir. 2015); *D'Angelo v. School Bd.*, 497 F.3d 1203, 1205, 1210 (11th Cir. 2007).

In *Batz*, for example, this Court rejected a city fire chief's claim of First Amendment retaliation involving allegations strikingly similar to the ones here. The

fire chief, like Acevedo, had complained about interference with his operation of his department, objecting to "attempts to undermine and delay his efforts to enforce the Safety Code . . . ." *Id.* at 898. During his termination, the fire chief was told "people are complaining about you and the fire codes," and that he was recommended for termination because of "numerous times he verbally proclaimed his distrust of council and administration and that they did not have his back." *Id.* at 896.

This Court held that, in making his objections, the fire chief was acting as an employee, not a citizen. The Court applied the principles provided by the Supreme Court in *Garcetti*: "The proper inquiry is a practical one" that should focus on "whether the employee's speech at issue 'owes its existence' to the employee's professional responsibilities." *Id.* at 898 (quoting *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015), and *Garcetti*, 547 U.S. at 421, 424). The fire chief was acting as an employee because he complained about "frustration related to interference with [his] job duties." *Batz*, 794 Fed. Appx. at 900 (quoting *King*, 916 F.3d at 1347).

Acevedo's speech is like that in *Batz*, a series of complaints about interference with his job functions. The Memorandum's introduction claims "certain City commissioners have interfered with the reform efforts and have interfered with a confidential internal investigation." Doc. 17-3 at 1. The Memorandum then provides three sections, each about purported "interference." The first is entitled "Interference

27

with MPD Internal Affairs Division (IAD) investigation." *Id.* Acevedo says he "never personally experienced such interference in a confidential law enforcement investigation," *id.* at 4, and ends by claiming "the Commissioners' interference in the confidential IAD investigation is not their only misconduct," *id*. The second section is entitled "Interference with Reform Efforts and MPD Staffing." *Id.* Acevedo complains about how Commissioners "hampered my reform" and "hampered my given mission to reform the MDP," and "the actions of these three Commissioners are part of a pattern of interference and intimidation . . . ." *Id.* at 6. His final section is also about interference, entitled, "Interference With and Improper Use of MPD Resources." *Id.* at 7. All of this is in a memo sent to his bosses, the city manager and mayor, *id.* at 1, signed by him as "Chief of Police," *id.* at 8, and prepared because of his "sworn duty," *id.* This is a police chief's complaint about interference with the operations of his department, not the speech of a private citizen.

      b.      Cases Like *Carollo*, Where Employees' Speech Occurred Outside Their Job Functions, Do Not Apply.

Acevedo argued below, and the District Court accepted, that he acted as a citizen, by relying on *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016), and *Gomez v. City of Doral*, No. 21-11093, 2022 WL 19201 (11th Cir. Jan. 3, 2022). *See, e.g.*, Doc. 37 at 4, 6. These cases are clearly distinguishable. In each, the employee's speech occurred outside of their job duties, while that is not the situation here.

28

In *Carollo*, this Court held that a city manager may have a plausible claim he acted as a citizen where he notified law enforcement that city commissioners violated campaign finance laws. *Carollo*, 833 F.3d at 1330-31. The Court so held because his "ordinary job duties as City Manager did not include anything to do with enforcing Florida's campaign finance laws." *Id.* at 1331. At the same time, the Court held that the city manager's alleged reports about "corruption" and other violations *failed* to state plausible claims that he spoke as a citizen because that speech was not clearly outside of his duties. *Id.* at 1331. *See also Gomez*, slip op. at *13 (citing *Carollo* and explaining that "nothing from the face of the complaint suggests that Gomez's 'ordinary job responsibilities' as a detective were implicated by this outside investigation into a public corruption scandal").

In contrast, where speech is related to an employee's job functions, this Court has repeatedly held that speech is not made as a citizen. *See Fernandez v. School Bd.*, 898 F.3d 1324, 1329 (11th Cir. 2018); *King*, 916 F.3d at 1350 (distinguishing *Carollo*); *Phillips v. City of Dawsonville,* 499 F.3d 1239,1241-42 (11th Cir. 2007) (holding that city treasurer and clerk's speech about a mayor's misconduct "relate to" and "touch on" matters involving official duties and therefore were not made as a private citizen; "[A] public employee's duties are not limited to those tasks that are specifically designated.").

Here, the Memorandum arose from Chief Acevedo's official duties. Chief

29

Acevedo objected to interference with the operation of the police department he was charged with directing. His objections went to the core of his ordinary job responsibilities, the "immediate direction and control of the police force," as stated in Section 24 of the City of Miami Charter, *see* Doc. 1 at 39, ¶ 275, and his "sworn duty," as he put it in his September 24, 2021 Memorandum's conclusion, *see* Doc. 17-3 at 9. To the extent Acevedo was reporting misconduct, that too fell withing his duties as the City of Miami's highest law enforcement officer. Miami's police chief is, unsurprisingly, "charged with responsibilities for the prevention, control and suppression of crime in the city." City of Miami Code § 42-3,

Acevedo's primary argument in opposition to dismissal, accepted by the District Court, was that City of Miami Resolution 20-0034 ("the Resolution") "precluded him – as the Chief of Police – from investigating and reporting on malfeasance by City officials." Doc 38 at 3. The plain language of the Resolution, however, limits its operation to *investigations* of the City Commissioners. Doc 41-1 at 1-2. Chief Acevedo's Complaint alleged no more than this. Doc 1 at 5-6, ¶¶ 33, 34. The Resolution did not strip Acevedo of his duty to *report* unlawful activity.

If anything, the opposite was true, and Acevedo had a heightened duty to report what others would investigate. The purpose of the Resolution was to prevent "perceived conflicts" caused by the City Commission being investigated by the City's own police force. Doc. 41-1 at 2. The Resolution requires Acevedo's superior,

30

the City Manager, to forward investigations to the FDLE and/or the FBI. Doc. 41-1 at 2. It thus remained within Police Chief Acevedo's official duties to report alleged misconduct to the City Manager or other authorities to enable an investigation if warranted. Acevedo himself recognized this in his Memorandum, invoking his "sworn duty to uphold the rule of law." Doc. 17-3 at 8. Acevedo's Memorandum was not written as a private citizen, but, as Acevedo himself declared, as chief of police of the Miami Police Department. That alone defeats his claim.

  2.  <u>The Memorandum Was Not Written as a Matter of Public Concern.</u>

The second prong of *Garcetti* "concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of only personal interest." *Alves*, 804 F.3d at 1162. The inquiry turns on "the content, form, and context of a given statement . . .." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *see also Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007). "[A]n employee's speech will rarely be entirely private or public." *Akins v. Fulton Cty.*, 420 F.3d 1293, 1304 (11th Cir. 2005). Accordingly, the Court must examine whether the "main thrust" of the speech is directed to a public or private concern. *King v. Board of County Comm'rs*, 916 F.3d 1339, 1347 (11th Cir. 2019); *Alves*, 804 F.3d at 1162; *Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993). The Court must determine "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167 (quoting *Maggio v. Sipple*, 211 F.3d 1346,

31

1353 (11th Cir. 2000) (emphasis added; internal quotations omitted)); *see also Boyce*, 510 F.3d at 1344; *Morgan*, 6 F.3d at 754.

These principles show Acevedo has not established protected speech. Though the Memorandum raised issues which might pique the public's interest, its main thrust was to promote Acevedo's interest in independently running the police department: its content was primarily about Acevedo's difficulty in managing the MPD due to interference by commissioners; its form was a workplace report provided in his official capacity; and its context was as a report delivered to his superiors in the midst of workplace dispute.

a.    The Memorandum Reported Interference to Superiors.

In the Memorandum's initial three paragraphs, Acevedo states his purpose: "This memorandum is to confirm my recent reports to you of misconduct of certain City Commissioners and to disclose additional misconduct to you in your leadership capacities with the City of Miami (City)." Doc. 17-3 at 1. Acevedo "confirms" because, as he alleges, he had previously reported allegations of interference orally to the same superiors. Doc. 1 at 17, ¶¶ 124-25 and at 22, ¶¶ 167-68. His Memorandum summarizes this "misconduct" as how "certain City commissioners have interfered with the reform efforts and have interfered with a confidential internal investigation." Doc. 17-3 at 1. Such reports to superiors are not intended as public statements. The remainder of the Memorandum reports interference in the

32

internal workings of his department. *See supra* at 10-12. In closing, Acevedo wrote he had "no choice but to memorialize and report the above series of improper acts . . .." Doc 17-3 at 8. To "memorialize and report" workplace interference, even where that interference is characterized as corruption, does not establish an intent to raise concerns with the public.

Acevedo cannot convert matters of public interest into speech addressed to public concerns. Undoubtedly, any report alleging public officials' misconduct would interest the public. But "the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue"; it is "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Alves*, 804 F.3d at 1167 (cleaned up).

Below, Acevedo argued, and the District Court accepted, that his Memorandum was regarding a matter of public concern because it referenced "excessive force" and "corruption," *see* Doc. 75 at 16, but these were not its focus. The Memorandum is an eight-page single-spaced document that mentions "unlawful use of force" only in one paragraph. On page 6, Acevedo mentioned that he uncovered a "pattern of unlawful use of force, and in some instances the chain of command has covered up the unlawful use of force …." Doc. 17-3 at 6. Acevedo thereafter states that the Commissioners' budget decisions interfered with his reform efforts regarding excessive force. *Id.* Similarly, the Memorandum discusses

33

"corruption" in only one paragraph, when it was raised by Defendant Carollo describing the City Code Enforcement Department. *Id.* at 7. Thus, the thrust of Acevedo's speech is to report the "misconduct" of Commissioners in "interfering" with the police department's resources and investigations, reducing the police budget, and removing staff positions that Acevedo wanted.

      b.      The Form of the Memorandum Shows It Was Not Intended for the Public.

Acevedo's Memorandum is formatted as an internal Police Department document, identified from the outset as "[t]his memorandum." Doc. 17-3 at 1. Acevedo uses his official title as "Chief" and addresses it to his superiors, Manager Arthur Noriega and Mayor Francis Suarez, "in [their] leadership capacities with the City of Miami," *id*. At the Memorandum's close, Acevedo signs and provides his official title, "Chief of Police" and "Miami Police Department." *Id.* at 8. Thus, the Memorandum's form does not indicate in any way that it was written for the public.

      c.      The Memorandum's Context Shows It Was Not Intended for the Public.

The context of the Memorandum again reveals that it was intended as an internal report. Acevedo wrote his Memorandum in response to Commissioners' acts, both privately and in public meetings, questioning his operation of the police department, cutting its budget, and asking him to look into potential criminal conduct. *See* Doc. 1 at 14-15, ¶¶ 108-118 (describing June 24, 2021 commission

meeting questioning the treatment of Officer Luis Camacho); *id.* at 20-21, ¶¶ 152-64 (describing Sept. 13, 2021 commission meeting eliminating police positions).

The Memorandum also shows it was written in a context where the Commissioners were highly critical of Acevedo. It states that Carollo, upset with the treatment of Officer Camacho, told Acevedo in a public meeting, "I will say this to you publicly chief, and please understand where I am coming from. **While I have been walking very softly, I carry a hell of a big stick** …." Doc. 17-3 at 2 (emphasis in original). Regarding the police budget, the same Commissioner said in a later public meeting, "If a department director had pulled this on me when I was City Manager before, he wouldn't be around." *Id.* at 5. The open conflict between Acevedo and his ultimate superiors also shows his Memorandum was written for his own interests. The First Amendment does not tend to protect speech made after negative employment actions are already in play. *See Boyce*, 510 F.3d at 1344 (holding employee speech related to personal grievances where that speech occurred after performance issues had been raised).

Acevedo also directed and sent the Memorandum to his superiors and not the public. "If a person observes formal workplace hierarchies, that suggests she was speaking as an employee." *King*, 916 F.3d at 1349. Besides his superiors, Acevedo sent it only to the Miami-Dade State Attorney's Office and the FBI. Doc. 1 at 23, ¶ 177. The Complaint further alleges Acevedo did not publish his Memorandum or

35

intend for it to become public, but instead it was "*leaked* to others, including the media." *Id.* at 25, ¶ 187 (emphasis added). Acevedo's limited and focused delivery of the Memorandum shows its main thrust was not a public concern. *See Batz*, 794 Fed. Appx. at 900; *King*, 916 F.3d at 1349; *Alves*, 804 F.3d at 1168.

The Memorandum's content, form and context thus show it was not intended for the public interest, and so it is not protected by the First Amendment.

**B.     The City Commission Had Adequate Justification for Treating Acevedo Differently from Members of the General Public under the *Pickering* Balancing Test.**

Acevedo's First Amendment retaliation claim also fails because the City Commission "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)). The *Pickering* balancing test requires the Court to weigh the Plaintiff's First Amendment interests against the government's interests in efficient operation. *Moss*, 782 F.3d at 618; *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989); *Morales v. Stierheim,* 848 F.2d 1145, 1149 (11th Cir. 1988). The Court should consider: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Morales*, 848 F.2d at 1149. The Court should also examine "whether the statement impairs discipline by superiors or harmony among

36

co-workers." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987), *quoted in Bryson*, 888 F.2d at 1567. Most importantly here, certain positions in government – those essential to making or effectuating policy, for example – are so critical that an employee's First Amendment protection is "often slight." *Bates v. Hunt*, 3 F.3d 374 (11th Cir. 1993).

The *Pickering* balance here weighs against Acevedo. As chief of police, Acevedo held a policymaking position which permits little to no First Amendment protection. At the same time, his Memorandum challenged "interference" through budget making by Commissioners who were entitled to rely on him to effectuate policy, and the Commissioners' inquiries during a Commission meeting into the Chief's handling of an officer's investigation.[5] Acevedo's position also governed the City's operation of its police force, a sensitive department where First Amendment rights often must give weigh to the need for order and discipline. The context of Acevedo's Memorandum, delivered in the midst of the City Commission's review of his performance, also shows his termination was justified.

---

[5] The Commissioners' inquiry regarding the investigation of Officer Camacho was made during an official City Commission meeting. The City Commission has the authority to investigate the official acts and conduct of any city official. *See* City of Miami Charter § 14. The statements and comments Acevedo complains of were made from the dais, acting within the scope of their discretionary authority as granted by the City Charter. *See id.*; *Carollo v. Platinum Advisors, LLC,* 319 So. 3d 686 (Fla. 3d DCA 2021) (finding that city commissioner was entitled to legislative immunity for conduct undertaken during a City Commission meeting in his capacity as a City Commissioner).

37

     1.     As Chief of Police, Acevedo Held a Policymaking Position Which Allows Little First Amendment Protection for his Memorandum.

The City of Miami relies on its police chief to enforce policies of the very Commission Acevedo was challenging. Miami's police chief is charged by law with "promulgat[ing] all orders, rules, and regulations for the government of the police force," City of Miami Charter § 24 & Doc. 1 at 39-40, ¶ 275. Acevedo was thus in a policymaking role, so the City Commissioners were entitled to terminate his employment. *Leslie v. Hancock County Bd. of Educ.*, 720 F.3d 1338, 1351 (11th Cir. 2013) (holding that "the executive officer on whom the board relied for the enforcement of its policies" is in a policymaking/confidential role justifying termination for policy disputes). For such employees, "First Amendment constitutional protection is often slight." *Bates v. Hunt*, 3 F.3d 374 (11th Cir. 1993). *See also Shahar v. Bowers*, 114 F.3d 1097, 1103 (11th Cir. 1997).

For example, in *Bates*, a governor's administrative assistant was fired after she helped litigation against him, contending his conduct was criminal. This Court held the assistant's termination was justified without examining the strength of her contention. None of the typical *Pickering* factors weighed in besides the nature of the plaintiff's position and the *possibility* of disruption: "[T]he Governor need not allow events to unfold to the point where disruption and inefficiency in the Governor's office become open and obvious, before he constitutionally can discharge an employee." *Bates*, 3 F.3d 374 at 378. Repeated cases have also justified

38

termination despite First Amendment protected speech where that speech undermined the employer's authority. *See Connick v. Myers*, 461 U.S. 138, 154 (1983); *Chesser v. Sparks*, 248 F.3d 1117, 1124 (11th Cir. 2001) (reversing denial of a motion to dismiss on qualified immunity grounds); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321 (11th Cir. 1989).

Because Acevedo had the prominent position of chief of police and he challenged both the City Commissioners' investigative and budget-making roles, the government's interest weighs extraordinarily heavily – and is indeed determinative – in the *Pickering* balance. Acevedo wrote and delivered his Memorandum as the Appellant City Commissioners were questioning his operation of the police department, cutting its budget, and asking him to look into potential criminal conduct. *See* Doc. 1 at 14-16, ¶¶ 108-118 (describing June 24, 2021 commission meeting questioning the treatment of Luis Camacho); *id.* at 20-21, ¶¶ 152-64 (describing Sept. 13, 2021 commission meeting eliminating police positions). He characterizes this budget decision as part of Commissioners' "efforts to meddle in the affairs of the MDP," Doc. 17-3 at 4, even though the City Commission is legally responsible for the City's budget and empowered to investigate all official actions. *See* City of Miami Charter §§ 4(a), 14. What Acevedo views as "interference" is, in fact, the Commissioners performing their duties as elected officials empowered by law. In performing those duties, those Commissioners were entitled to fire a police

39

chief, the City's highest law officer, who was openly at odds with them.

> 2.    The Disputative Context of Acevedo's Termination Further Shows He Cannot Satisfy *Pickering* Balancing.

The context of Acevedo's speech is important because it reveals a police chief already at war with the Commission. "[W]here an employee's speech arises out of his own ongoing personnel dispute, 'additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.'" *Morales v. Stierheim*, 848 F.2d 1145, 1150 (11th Cir. 1988) (quoting *Connick*, 461 U.S. at 153). Acevedo sent his Memorandum in the midst of his personnel dispute, after and in reaction to a Commission meeting eliminating police positions he wanted. Doc. 1 at 20-22, ¶¶ 152-66. Acevedo's Memorandum complains at length about the Commission's budgeting at that meeting. Doc. 17-3 at 4-7. The context thus shows Acevedo was threatening the City Commission's authority.

The balance weighs particularly heavily against Acevedo because his disputes with the City Commission involved the management of the City's police department. Acevedo admits in his Memorandum that he "expressed [his] concerns" about the City Commission "interference" to the police staff. Doc. 17-3 at 4. "In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers." *Oladeinde v. City of*

*Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000). *See also Autrey v. Davis*, 355 Fed. Appx. 253, 255 (11th Cir. 2009). The City Commission is the ultimate authority over the police department, with the power to determine its budget, rule upon the discipline or firing the police chief, and direct the city manager to whom the chief reports. *See* City of Miami Charter §§ 4(a), 24, 26. Acevedo's challenge to that authority once again fails the *Pickering* balancing test.

The District Court was persuaded by Acevedo's argument that the record does not reveal actual disruption of the police force. The City Commission, however, was not required to await turmoil among the rank-and-file officers before acting.[6] *See, e,g.*, *Bates*, 3 F.3d at 378. Potential turmoil from a police chief's defiance of the City's highest elected body was enough to justify his termination. Acevedo cannot satisfy *Pickering* balancing.

## II.    ACEVEDO'S TERMINATION AS MIAMI'S POLICE CHIEF DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

Even if he can establish his Memorandum constitutes protected speech and satisfies *Pickering*, Acevedo's claim fails because he cannot satisfy the "immunity" prong of qualified immunity. The law is not so clearly established that Appellant City Commissioners had fair warning of unconstitutional conduct.

---

[6] The Suspension Memorandum does, in fact, reveal that Acevedo was terminated because he "lost the confidence and trust of the rank-and-file and, as of 10/1/21, the executive staff." Doc. 24-1 at 2. He was also terminated because he "did not recognize the reality of the morale problem." *Id.* at 3.

There are three methods to show that the government official had fair warning:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (reversing denial of qualified immunity in a First Amendment retaliation claim). The latter two, "obvious clarity" methods rarely apply. *Id.* at 1209.

To show that a constitutional violation was clearly established by a "materially similar" case, "[a] close factual fit between the pre-existing case and the present one is essential." *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020); *see also Gaines*, 871 F.3d at 1209-10. "'[C]learly established law' should not be defined at a high level of generality. . .. [T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79-80, 137 S. Ct. 548, 552 (2017), *quoted in Gaines*, 871 F.3d at 1207; *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). "General propositions from earlier decisions will not do." *Cantu*, 974 F.3 at 1232. A case does not have to be directly on point, but the facts must be close enough to have "placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). "The key question is whether the decision in the pre-existing case 'make[s]

42

it obvious to all reasonable government actors" that their behavior violates federal law.'" *Cantu*, 974 F.3d at 1232 (quotation omitted); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In that way, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who would knowingly violate the law.'" *Hunter*, 502 U.S. at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

Because First Amendment jurisprudence is so fact specific, Acevedo's burden is extraordinarily high. "It is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines*, 871 F.3d at 1210 (citing as examples *Maggio*, 211 F.3d at 1354; *Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998); *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994); *Dartland v. Metropolitan Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)).

Police Chief Acevedo cannot satisfy his burden. This circuit's binding law does not make his constitutional claim readily apparent. In fact, that law shows he had no constitutional protection at all.

## A.    No Materially Similar Case Establishes Police Chief Acevedo's Memorandum Is Protected by the First Amendment.

Acevedo has not provided any binding case holding the First Amendment protects a police chief's memorandum reporting to his superiors that elected officials, often during budget meetings and public hearings, interfered with his management and committed alleged misconduct. At the same time, there are many

43

cases showing that such a memorandum would *not* be protected. *See supra* § I.A. On that basis alone, Acevedo cannot show a violation of clearly established law. *See, e.g.*, *Lane v. Frank*, 573 U.S. 228, 243-46 (2014) (holding that even where First Amendment protection applied, qualified immunity prevented individual liability where Eleventh Circuit law was mixed).

Below, the District Court never considered the full impact of those exculpatory cases. Instead, led to error by Acevedo, the District Court reasoned that "[t]he Eleventh Circuit has held multiple times that where a government employee blows the whistle on government corruption, it is unlawful to retaliate against the employee." Doc. 75 at 29. This is the very sort of "high level of generality" the Supreme Court has repeatedly forbidden. *White*, 137 S. Ct. at 552. A holding that an employee who "blew the whistle on government corruption" enjoys First Amendment protection is so broad it provides no fair warning at all.

Cases equally hold that government employees who "blew the whistle" had no First Amendment protection because their reporting was part of their jobs. "In similar situations following *Garcetti* of government employees' challenging their terminations because they reported alleged wrongdoing in government offices, [this Court] determined that commentary by government employees concerning alleged wrongdoing in a government office was related to the government employees' jobs and, therefore, they were not speaking as private citizens for the purpose of First

44

Amendment, retaliation claims." *Boyce v. Andrew*, 510 F.3d 1333, 1346 & n.15 (11th Cir. 2007), *citing Phillips v. City of Dawsonville*, 499 F.3d 1239, 1241-43 (11th Cir. 2007); *Villa v. Padròn*, 494 F.3d 1334, 1339 (11th Cir. 2007)). Because *Boyce*, *Phillips*, and *Villa* show this circuit's law regarding "whistleblowing" is mixed at best, qualified immunity applies. *See Lane*, 573 U.S. at 243-46.

Each case utilized by Acevedo is materially distinguishable. In each, the employees' speech was clearly outside their duties, was made for a public purpose, and did not involve raising issues of management interference with superiors. In *Carollo*, a city manager reported election-law violations to law enforcement authorities. The defendants did not dispute that the plaintiff spoke on a matter of public concern, and they had "no plausible argument" that the city manager's duties included enforcing campaign finance laws. *Carollo*, 833 F.3d at 1322. In *Akins v. Fulton County*, 420 F.3d 1293 (11th Cir. 2005), county purchasing department employees set a special meeting with a county commissioner where they reported bid irregularities, and then they suffered adverse employment action when their superior found out. The Court held "that speech whose 'main thrust' is to report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment." *Id.* at 1308. *Akins* thus bears little resemblance to this case. In *Walker v. Schwabe*, 112 F.3d 1127 (11th Cir. 1997), a budget director raised concerns with elected officials about misspending and was subsequently

demoted. In deciding the case pre-*Garcetti*, the Court did not even analyze whether the plaintiff was acting as a private citizen. The Court held that meeting with elected officials about misspending was a matter of public concern and (by split panel) was clearly established as protected by the First Amendment from retaliation.

None of these cases gave the City Commissioners fair warning that terminating Police Chief Acevedo would violate the First Amendment. None involved a police chief with wide-sweeping duties reporting up the chain of command and copying only other law enforcement. None of them involved reporting "interference" with management which included publicly aired budget decisions. All involved acts that were outside the scope of the employee's duties (or pre-*Garcetti* as in *Walker*, the issue was never analyzed). None of them is analogous to this case regarding Chief Acevedo's broad duties or the content, form, or context of the Memorandum. None establishes that Police Chief Acevedo's Memorandum, which complained of Appellant City Commissioners' interference or inquiries during Commission meetings and their budgetary decisions, clearly constitutes speech protected by the First Amendment. Accordingly, qualified immunity applies.

**B.      No Materially Similar Case Establishes Acevedo's Termination Violated the *Pickering* Balancing Test.**

The district court never analyzed qualified immunity using the *Pickering* framework. *See* Doc. 75 at 27-30. Yet, based on qualified immunity, the Individual Defendants are entitled to dismissal "unless the *Pickering* balance 'would lead to the

*inevitable conclusion* that the discharge of the employee was unlawful.'" *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991) (emphasis added; quoting *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)). *See also Stanley v. City of Dalton*, 219 F.3d 1280, 1298 (11th Cir. 2000). "In the context of a First Amendment retaliation claim, we have recognized that a defendant 'will only rarely be on notice that his actions are unlawful' because applying the *Pickering* balancing 'involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules." *Brannon v. Finkelstein*, 754 F.3d 1269, 1278 (11th Cir. 2014) (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000)). The *Pickering* balance "must tilt decidedly in favor of the plaintiff's speech in order for the defendants to have fair and clear notice that they were violating the plaintiff's constitutional rights." *Camp v. Corr. Med. Serv. Inc.*, 400 Fed. Appx. 519, 520-521 (11th Cir. 2010).

Acevedo cannot meet that burden. He did not point to any binding, materially similar case, and the *Pickering* balance tilts *against* Acevedo rather than decidedly in his favor. Because, as police chief, Acevedo served in an essential policymaking function, the City Commission was entitled to terminate him due to disputing its policies. "No clearly established law bars the termination of a policymaking or confidential employee for speaking about policy." *Leslie*, 720 F.3d at 1349; *see also Bates*, 3 F.3d at 378. Acevedo's "interference" complaint repeatedly attacks the

47

police budget decisions central to the Commission's role. Doc. 1 at 20-21, ¶¶ 152-64 (describing Sept. 13, 2021, commission meeting eliminating police positions); Doc. 17-3 at 4 (characterizing budget decisions as part of commissioners' "efforts to meddle in the affairs of the MDP"). He threatened the authority of the City Commissioners; he was in the midst of their employment review when he sent his Memorandum; and he was charged with running the police department the City needs to operate smoothly. The First Amendment does not shield such a rebellious employee with protection, but even if it arguably did, qualified immunity would apply. A city's highest elected officials cannot wait and worry whether they must answer to their police chief on their budget decisions while risking personal liability in federal litigation. So, in no way can the *Pickering* balancing test result in "the inevitable conclusion that the discharge of the employee was unlawful.'" *Busby*, 931 F.2d at 774. Again, qualified immunity applies.

### C.    The Pleadings Establish a Mixed Motive So Qualified Immunity Defeats Acevedo's Claims.

Acevedo's Complaint also cannot survive qualified immunity because he cannot plausibly show that any Appellant Commissioner – each only one member of a five-member commission presented with four witnesses about Acevedo's failures – caused Acevedo's termination due to a First Amendment violation. In the context of qualified immunity, a defendant cannot be held liable for First Amendment retaliation where motivated at least in part by a single lawful

consideration. *Brannon*, 754 F.3d at 1278-79; *Stanley*, 219 F.3d at 1295-96; *Foy*, 94 F.3d at 1535. Where the facts "show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity." *Jackson v. Humphrey*, 776 F.3d 1232, 1241 (11th Cir. 2015) (citing *Foy v. Holston*, 94 F.3d 1528, 1533 (11th Cir. 1996)). *See also Wall-Desousa v. Florida Dep't of Highway Safety*, 691 Fed. Appx. 584 (11th Cir. 2017) (affirming dismissal of a complaint based on qualified immunity where the record established a lawful motivation). The facts known to the official, not the subjective motivation, are at issue. "For qualified immunity purposes, the subjective motivation of the defendant-official is immaterial." *Hansen v. Soldenwagner*, 19 F.3d 573, 578 (11th Cir. 1994). *See also Foy*, 94 F.3d at 1533.

Beyond that, if *any* of the three Appellant Commissioners had any lawful motivation, Acevedo's claim fails for all, because Acevedo was fired by the City Commission as a whole. To establish causation based, as here, on the decision of a multi-member board, a plaintiff must show that the majority had an illegal motive in making its employment decision. *See Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 284-87 (1977); *Stimpson v City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

Acevedo cannot defeat qualified immunity under these standards. The Miami City Commission consists of five members, and the decision to terminate Acevedo

49

was unanimous. Doc. 1 at 20, ¶ 226. Acevedo does not allege any facts showing improper motivation regarding two of the members. Below he in fact confessed those commissioners "may have had proper motivations," Doc. 37 at 17, admitting there were lawful grounds to terminate him. Further, the Suspension Memorandum provides several objectively legitimate reasons for termination:

- losing the confidence of the rank-and-file officers due to threats and verbal assaults;

- using offensive language with a civilian during a protest;

- making a "Cuban Mafia" comment to departmental staff;

- failing timely to report damage to his vehicle as required by protocols, while terminating subordinates for protocol violations;

- failing to report personal/vacation time;

- disobeying the city manager by making an unauthorized employment offer to a former colleague; and

- failing to provide an adequate action plan as requested by the city manager.

*See* Doc. 1 at 28-30, ¶¶ 212-20, 226 & Doc. 24-1 at 2-3.

At his termination hearing, counsel for City Manager Noriega called four witnesses, including himself. Doc. 1 at 29, ¶ 220. With two unbiased, properly motivated commissioners voting for Acevedo's termination after an evidentiary presentation including four witnesses, any reasonable reading of these facts establishes Acevedo cannot defeat qualified immunity.

50

Acevedo's Complaint also reveals that even before he sent his Memorandum, the City Commission was disgusted with his performance, criticizing his management and questioning police operations and its budget. *See* Doc. 1 at 14-16, ¶¶ 108-118 (June 24, 2021 meeting, questioning treatment of Officer Camacho); *id.* at 20-21, ¶¶ 152-64 (Sept. 13, 2021 meeting, questioning and revising the police budget). Acevedo himself alleges that he was terminated not because of his Memorandum, but because he "refused to bow to the Defendant Commissioners' pressure". *Id.* at 19, ¶ 143.

In response, Acevedo alleges that the reasons for his termination were "pretextual." Doc. 1 at 28, ¶ 213. Conclusory statements are insufficient to satisfy pleading requirements. *Ashcroft*, 556 U.S. at 678-79, 680-81; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 129 S. Ct. 1937 (2009); *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). Neither can Acevedo reconcile that naked assertion with the rest of his pleading. Below, he also relied on a statement by City Manager Noriega that Acevedo had "gone too far" with his Memorandum and Noriega needed to "stop the bleeding." Doc. 37 at 18 (citing Doc. 1 at 29, ¶ 216). Even favoring Acevedo, that allegation shows nothing about the decision-making City Commissioners' motivations. Appellant City Commissioners had a legitimate basis to terminate Acevedo's employment, established by an evidentiary hearing and two properly motivated decisionmakers, so they are entitled to qualified immunity.

51

Although mixed-motive analysis is often applied in the context of summary judgment, dismissal is also appropriate where, as here, the pleadings establish a legal motivation. *Ashcroft*, 556 U.S. at 682; *Wall-Desousa*, 691 Fed. Appx. at 593 n.5. While it may be tempting to have a more fulsome record, that principle lacks force in the context of qualified immunity. *Hunter v. Bryant*, 502 U.S. at 227; *Mitchell*, 472 U.S. at 526. The present record establishes legitimate reasons for Acevedo's termination, so he cannot defeat qualified immunity. His claims against the Appellant City Commissioners must therefore be dismissed.

## III.   THE COMMISSIONERS ARE ENTITLED TO LEGISLATIVE IMMUNITY FOR ACTIONS TAKEN IN THEIR LEGISLATIVE CAPACITY.

The district court erred in its sweeping denial of legislative immunity to the Commissioners by generalizing that the subject conduct constituted administrative employment decisions not protected by absolute legislative immunity. In doing so, the district court overlooked Acevedo's repeated allegations about conduct that can only be categorized as purely legislative. The bulk of Acevedo's claims seek to hold Appellant Commissioners responsible for legislative actions conducted on the public record at publicly noticed commission meetings at which they exercised their legislative prerogative to make policy decisions governing the City. These actions are protected by legislative immunity and should be stricken from the Complaint and dismissed.

Legislative immunity, a form of absolute immunity, protects legislators from having to answer for conduct in a civil lawsuit. *Mitchell v. Forsyth*, 472 U.S. 511, 525, 105 S. Ct. 2806, 2815 (1985); *see Harris v. Deveaux*, 780 F.2d 911, 913 (11th Cir. 1986) ("Absolute immunity is meant to protect not only from liability, but from going to trial at all."); *Scott v. Taylor*, 405 F.3d 1251, 1254 (11th Cir. 2005). The absolute immunity protecting legislative functions is not limited to merely the passing of bills and ordinances but also encompasses "conduct in the furtherance of [legislative] duties." *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193 (5th Cir. 1981), *cert. denied*, 455 U.S. 907, 102 S. Ct. 1251 (1982); *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) ("The absolute immunity of legislators, in their legislative functions, ... now is well settled.") (citations omitted); *see Tower v. Glover*, 467 U.S. 914, 920, 104 S. Ct. 2820, 2824 (1984). Absolute immunity equally encompasses local legislators. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S. Ct. 1171 (1979); *Tenney v. Brandhove*, 341 U.S. 367, 71 S. Ct. 783 (1951); *Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1539 (11th Cir.), *cert. denied*, 502 U.S. 810, 112 S. Ct. 55 (1991); *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1189 (11th Cir. 1993); *Fuller v. Carollo*, 2022 WL 333234, *3 (11th Cir. 2022). Legislators' "subjective motivations are irrelevant to absolute legislative immunity." *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d at 1192.

The district court's Order swept away the obvious legislative activity protected by absolute immunity, including these representative examples of allegations in the Complaint:

¶ 28: Passing Resolution R-20-0034.

¶ 30: Directing the Manager to forward investigations of City officials to FDLE and/or FBI.

¶ 35: Prohibiting Acevedo from investigating elected officials.

¶¶ 56-67: Actions at the April 22, 2021 Commission meeting including passing a resolution "to create and implement an operational task force to combat criminal activities pertaining to narcotics, prostitution, human trafficking, and illegal gambling." And identifying places suitable for investigation in furtherance of the legislation.

¶¶ 80-84: Meeting with Commissioner Carollo to discuss "Operation Dry Hour and code enforcement generally …"

¶¶ 108-120: The June 24, 2021 Commission meeting on the "pocket item" concerning Sergeant Camacho, and follow-up meetings.

¶¶ 126-131: December 9, 2021 Commission meeting on the "housekeeping pocket item for police department funding."

¶¶ 152-164: September 13, 2021 Commission meeting discussion and budget votes concerning the police department.

These and other actions identified in the Complaint include policy discussions at Commission meetings, policy decisions, budget considerations, passing legislation, and policy determinations for the Police Department. Because these actions uniquely involve the exercise of legislative prerogative "in furtherance of [legislative] duties" involving the legislative function, those items "bore all the

54

hallmarks of traditional legislation" and are thus subject to absolute legislative immunity. *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009); *Hernandez v. City of Lafayette*, 643 F.2d at 1193. Acevedo's insistence "of an unworthy purpose does not destroy the privilege." *Bryant v. Jones,* 575 F.3d at 1307.

O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1373 (S.D. Fla. 2016), is analogous to this case. That plaintiff claimed a parking ordinance "violated his First Amendment rights because the motivation for its enactment was to suppress his" protected speech. *Id*. at 1373. The retaliation claims failed because an allegedly improper motivation for enacting an otherwise neutral ordinance does not constitute First Amendment retaliation. *Id*.

Similarly, in this case, the actions described in the Complaint fall within the commissioners' official responsibilities and are fundamental aspects of their legislative obligations, including fact-finding, making inquiries, conducting district inspections, speaking out about perceived violations of zoning and code enforcement ordinances as a matter of public policy priorities, and voting on legislation that Acevedo viewed as retaliatory in nature. These actions, all taken within the scope of a commissioner's duties, were part and parcel of the legislative prerogative. Because an objective reading of the identified conduct contained in the Complaint demonstrates that these actions occurred within the "legitimate sphere of legislative activity[,]" absolute legislative immunity applies here. *Eastland v. United States*

55

*Servicemen's Fund*, 421 U.S. 491, 503, 95 S. Ct. 1813, 1821 (1975). This immunity is essential "to insure that the legislative function may be performed independently without fear of outside interference." *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731, 100 S. Ct. 1967 (1980). This Court should direct that legislative immunity extends to the portions of the Complaint that involve legislative and policy matters, including all statements made during and in connection with City Commission meetings, specifically paragraph 28-34, 56-67, 74-75, 108-124, 126-138, 140-142, 152-164, 171, 173, 175, 188-200, 201-211, 219-228.

## CONCLUSION

For the foregoing reasons, the district court's Order, Doc. 75, should be reversed, with instructions to dismiss the claims against the Appellant City Commissioners.

Dated: April 8, 2025

Respectfully submitted,

| | |
|---|---|
| By: /s/ *Thomas A. Tucker Ronzetti.* | **BENEDICT P. KUEHNE** |
| **THOMAS A. TUCKER RONZETTI** | **KUEHNE DAVIS LAW, P.A.** |
| tr@tuckrlaw.com | 100 SE 2 Street, Suite 3650 |
| **TUCKER RONZETTI, P.A.** | Miami, FL 33131 |
| 5760 SW 46th Terrace | Tel: 305.789.5989 |
| Miami, FL 33155 | Ben.Kuehne@KuehneLaw.com |
| Tel: 305.546.4638 | Efiling@KuehneLaw.com |
| *Counsel for Appellant Diaz de la Portilla* | *Counsel for Appellant Carollo* |

**FRANK QUINTERO, JR.**
FQuintero@Quinterolaw.net
**QUINTERO BROCHE &**
**FONSECA-NADER, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel: 305.446.0303
*Counsel for Appellant Reyes*


**JOSE M. QUIÑON**
JQuinon@Quinonlaw.com
**JOSE M. QUIÑON, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel: 305.858.5700
*Counsel for Appellant Reyes*

**JAVIER A. LOPEZ**
**VEDDER PRICE (FL), LLP**
600 Brickell Avenue, Suite 1500
Miami, FL 33131
Tel: 786.741.3177
jlopez@vedderprice.com
*Counsel for Appellant Diaz de la Portilla*

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE REQUIREMENTS AND TYPE-STYLE REQUIREMENTS

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(a) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,549 words.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 8, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or parties of interest via either transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  */s/ Thomas A. Tucker Ronzetti*
Thomas A. Tucker Ronzetti