**No. 24-12650**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**HUBERT ARTURO ACEVEDO,**
*PLAINTIFF-APPELLEE*,

v.

**ALEX DIAZ DE LA PORTILLA, ET AL.,**
*DEFENDANTS-APPELLANTS*.

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-CV-20224-CIV-KMW

---

**APPELLEE ACEVEDO'S ANSWER BRIEF TO
APPELLANTS COMMISSIONERS' AND MANAGER NORIEGA'S
INITIAL BRIEF**

Marcos Daniel Jiménez
Cristina Moreno
**León Cosgrove Jiménez, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Email: mdj@leoncosgrove.com
Email: cmoreno@leoncosgrove.com

*Counsel for Appellee*

Heaven Chee
Sam Linn
**León Cosgrove Jiménez, LLP**
700 Louisiana Street, Ste 5300
Houston, Texas 77002
Telephone: 346.250.5664
Email: hchee@leoncosgrove.com
Email: slinn@leoncosgrove.com

*Counsel for Appellee*

**APPELLEE ACEVEDO'S CERTIFICATE OF INTERESTED PERSONS**

1.    Acevedo, Hubert Arturo (Appellee)

2.    Aguirre, Linette M. (Counsel for City of Miami)

3.    Capdevila, Bryan E. (Counsel for City of Miami)

4.    Carollo, Joe (Appellant)

5.    Chee, Heaven (Counsel for Appellee)

6.    City of Miami (Defendant)

7.    City of Miami Office of the City Attorney

8.    Diaz de la Portilla, Alex (Appellant)

9.    Fonseca-Nader, Jessica (Counsel for Appellant)

10.    Jiménez, Daniel Marcos (Counsel for Appellee)

11.    Jones, Kevin R. (Counsel for City of Miami)

12.    Jose M. Quinon, P.A.

13.    Kozyak Tropin & Throckmorton PA

14.    Krinzman Huss Lubetsky Feldman & Hotte

15.    Kuehne, Benedict P. (Counsel for Appellant)

16.    Kuehne Davis Law, PA.

17.    León Cosgrove Jiménez, LLP

18.    Linn, Sam T. (Counsel for Appellee)

19.    Lopez, Javier Asis (Counsel for Appellant)

20.    Lorigas, Michael Robert (Counsel for Appellant)

21.    McNully, Kerri L. (Counsel for City of Miami)

22.    Moreno, Cristina (Counsel for Appellee)

C-1 of 2

23.    Noriega, Arthur (Appellant)

24.    Panoff, Stephanie K. (Counsel for City of Miami)

25.    Pertnoy, Mason A. (Counsel for Appellant)

26.    Quiñon, Jose M. (Counsel for Appellant)

27.    Quintero, Jr. Frank (Counsel for Appellant)

28.    Quintero Broche, P.A.

29.    Reyes, Manolo (Appellant)

30.    Robert W. Rodriguez, P.A.

31.    Rodriguez, Robert William (Counsel for Appellant)

32.    Ronzetti, Thomas A. Tucker (Counsel for Appellant)

33.    Torres, Edwin J. (United States Magistrate Judge)

34.    Tucker Ronzetti, P.A.

35.    Williams, Kathleen M (United States District Judge)

36.    Wyson, George (Counsel for Appellant)


## CORPORATE DISCLOSURE STATEMENT

None of the interested individuals or entities are subsidiaries, conglomerates, affiliates, or parent corporations of any publicly held corporation.

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

The district court's opinion was thorough and sound and, as such, oral argument is unnecessary to resolve the issues on appeal.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-2

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF THE FACTS ........................................................................3

COURSE OF PROCEEDINGS BELOW...........................................................12

STANDARD OF SCOPE AND REVIEW ..........................................................13

SUMMARY OF ARGUMENT .......................................................................14

ARGUMENT .............................................................................................18

   I.  Chief Acevedo satisfied both prongs of the qualified immunity analysis......18

  II.  Chief Acevedo's speech was protected by the First Amendment.................18

     A. Chief Acevedo spoke as a private citizen.................................................19

        1. Chief Acevedo's Memorandum was protected speech because of the Resolution...................................................................................20

        2. Chief Acevedo's writing and circulation of his Memorandum was outside the scope of his ordinary job duties. .....................................21

        3. Even Manager Noriega acknowledged Chief Acevedo's speech was outside his ordinary responsibilities.................................................24

        4. The Commissioners can point to no authority that justifies a different legal finding....................................................................................25

     B. Chief Acevedo spoke on matters of public concern.............................27

1. Chief Acevedo's speech concerned corruption.....................................28

2. Chief Acevedo's speech concerned police reform. ............................29

3. Chief Acevedo's speech was neither administrative nor self-interested ...................................................................................29

C. The district court rightly found that Chief Acevedo's interest outweighed the City's interest under the *Pickering* balancing test.............................32

1. Chief Acevedo's interest in his free speech outweighed the City's interests........................................................................................33

2. Chief Acevedo's speech was not administrative or policy-oriented...35

D. Chief Acevedo pleaded there was causation between his speech and the adverse employment actions directed at him. .........................................37

1. Chief Acevedo alleged multiple adverse employment actions that followed closely after the circulation of his Memorandum. ...............38

2. Any mixed-motive inquiry is premature. ...........................................40

3. The Appellants cannot rely on the Suspension Letter........................42

III. The Commissioners are not entitled to dismissal on qualified immunity grounds. ....................................................................................................43

A. Chief Acevedo pleaded a plausible claim that the Commissioners violated his First Amendment rights. ......................................................45

B. Courts have articulated a broad statement of principle that gave the Commissioners fair notice of Chief Acevedo's constitutional right........45

C. The district court need not have weighed the allegations and inferences under a *Pickering* framework...................................................................48

IV. Manager Noriega has no valid grounds to distinguish his defense from the Commissioners'..................................................................................50

A. Suspension constitutes an adverse employment action..........................51

B. Manager Noriega's alleged actions would chill or deter a reasonable person from exercising the right to speak. ..............................................54

C. Manager Noriega had notice and fair warning that his actions would violate Chief Acevedo's First Amendment rights.....................................56

V. The Commissioners are not entitled to dismissal on legislative immunity grounds..................................................................................................57

CONCLUSION..................................................................................................59

CERTIFICATE OF COMPLIANCE....................................................................60

CERTIFICATE OF SERVICE ............................................................................61

# TABLE OF AUTHORITIES

Page(s)

Cases

*Acosta v. Miami-Dade County*,
  97 F.4th 1233 (11th Cir. 2024)..............................................................44

*Akeem Fuller, v. Warren Cty. Educ. Serv. Ctr.*,
  No. 1:21CV451, 2022 WL 445815 (S.D. Ohio Feb. 14, 2022)...........................29

*Akins v. Fulton County, Ga.*,
  420 F.3d 1293 (11th Cir. 2005) .................................................. passim

*Alves v. Bd. of Regents of the Univ. Sys. of Georgia*,
  804 F.3d 1149 (11th Cir. 2015) .............................................................25

*Ashcroft v. al-Kidd*,
  563 U.S. 731, (2011)..........................................................................44

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................27

*Basson v. Mortg. Elec. Registration Sys., Inc.*,
  741 F. App'x 770 (11th Cir. 2018)..........................................................43

*Bates v. Hunt*,
  3 F.3d 374 (11th Cir. 1993) ......................................................... 35, 37

*Batz v. City of Sebring*,
  794 F. App'x 889 (11th Cir. 2019)..................................................... 25, 26

*Beckwith v. City of Daytona Beach Shores, Fla.*,
  58 F.3d 1554 (11th Cir. 1995)...............................................................33

*Belyeu v. Coosa Cty. Bd. of Educ.*,
  998 F.2d 925 (11th Cir. 1993)...............................................................32

*Bogle v. McClure*,
  332 F.3d 1347 (11th Cir. 2003)..............................................................40

*Boyce v. Andrew*,
  510 F.3d 1333 (11th Cir. 2007)...................................................... 19, 37

v

*Brown v. Crawford Cty., Ga.*,
  960 F.2d 1002 (11th Cir. 1992).................................................................57

*Bryson v. City of Waycross*,
  888 F.2d 1562 (11th Cir. 1989)................................................. 28, 33, 46, 47, 48

*Carollo v. Boria*,
  833 F.3d 1322 (11th Cir. 2016)................................................. 18, 23, 45, 46, 48

*Concordia v. Bendekovic,*
  693 F.2d 1073 (11th Cir.1982)................................................................42

*Connick v. Myers*,
  461 U.S. 138 (1983)........................................................................ 27, 57

*Cook v. Gwinnett Cnty. Sch. Dist.*,
  414 F.3d 1313 (11th Cir. 2005)............................................................ 18, 37, 42

*Crymes v. DeKalb Cty., Ga.*,
  923 F.2d 1482 (11th Cir. 1991)................................................................ 13, 58

*Echols v. Lawton*,
  913 F.3d 1313 (11th Cir. 2019)................................................................ 43-44

*Espanola Way Corp. v. Meyerson*,
  690 F.2d 827 (11th Cir. 1982)................................................................57

*Fikes v. City of Daphne*,
  79 F.3d 1079 (11th Cir. 1996)................................................................29

*Foy v. Holston*,
  94 F.3d 1528 (11th Cir. 1996)................................................................40

*Garcetti v. Ceballos*,
  547 U.S. 410 (1951)................................................................ 16, 19, 22, 28, 46

*Gilmore v. Georgia Dep't of Corr.*,
  111 F.4th 1118 (11th Cir. 2024) ................................................................18

*Gomez v. City of Doral*,
  No. 21- 11093, 2022 WL 19201 (11th Cir. Jan. 3, 2022) .................... 24-25, 27, 31

*Green v. Finkelstein*,
73 F.4th 1258 (11th Cir. 2023)...............................................................18

*Gupta v. Fla. Bd. of Regents*,
212 F. 3d 571 (11th Cir. 2000)...............................................................52

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*,
910 F.3d 1186 (11th Cir. 2018) ....................................................... 42-43

*Hope v. Pelzer*,
536 U.S. 730 (2002)................................................................... 49, 57

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024) ....................................... 44, 49, 50, 56

*Kang v. Mayor & Alderman of City of Savannah*,
No. 24-12136, 2025 WL 753376 (11th Cir. Mar. 10, 2025)................................37

*Keating v. City of Miami*,
598 F.3d 753 (11th Cir. 2010) ........................................... 13, 37, 43, 49

*King v. Bd. Of Cnty. Commissioners*,
916 F.3d 1339 (11th Cir. 2019) ....................................................... 26, 30

*Lane v. Franks*,
573 U.S. 228 (2014)................................................... 20, 23, 28, 48

*Martin v. Baugh*,
141 F.3d 1417 (11th Cir. 1998).........................................................57

*Mitchell v. Hillsborough County*,
468 F.3d 1276 (11th Cir. 2006).........................................................27

*Moates v. Jarrard*,
No. 24-887, 2025 WL 1426679 (U.S. May 2025)...............................44

*Moss v. City of Pembroke Pines*,
782 F.3d 613 (11th Cir. 2015)....................................................... 19, 37

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968)................................................................... passim

vii

*Prosper v. Martin*,
  989 F.3d 1242 (11th Cir. 2021)..............................................................................44

*Rodin v. City of Coral Springs*,
  229 F. App'x 849 (11th Cir. 2007).........................................................................31

*Smith v. Lomax*,
  45 F.3d 402 (11th Cir. 1995)..................................................................................58

*Snyder v. Phelps*,
  562 U.S. 443 (2011)................................................................................................27

*Speak v. Whidden*,
  No. 2:18-CV-826-JLB-NPM, 2021 WL 765467 (M.D. Fla. Feb. 26, 2021)........38

*Stanley v. City of Dalton, Ga.*,
  219 F.3d 1280 (11th Cir. 2000).......................................................................38, 40

*Stavropoulos v. Firestone*,
  361 F.3d 610 (11th Cir. 2004).................................................................................52

*Stough v. Gallagher*,
  967 F.2d 1523 (11th Cir. 1992)...............................................................................33

*Walker v. Schwalbe*,
  112 F.3d 1127 (11th Cir. 1997) ...........................................................46, 47, 48, 56

*Wideman v. Wal-Mart Stores, Inc.*,
  141 F.3d 1453 (11th Cir. 1998)..........................................................................52-53

*Willingham v. City of Valparaiso, Fla.*,
  97 F. Supp. 3d 1345 (N.D. Fla. 2015).................................................................39-40

Statutes

42 U.S.C. § 1983 .........................................................................................................2

Fla. Stat. § 112.3187 ...............................................................................................2, 12

Rules

Federal Rule of Appellate Procedure 25 ...................................................................61

Federal Rule of Appellate Procedure 27 ...................................................................60

ix

Federal Rule of Appellate Procedure 32 ...................................................................60

**STATEMENT OF THE ISSUES**

1.    Whether the district court correctly held that Chief Acevedo's speech, which reported the Commissioners' corruption, abuse of power, and weaponization of the Miami Police Department, was protected by the First Amendment;

2.    Whether the district court correctly held that the Appellants are not entitled to qualified immunity because their retaliatory acts towards Chief Acevedo for reporting their corruption, abuse of power, and weaponization violated his clearly established constitutional rights; and

3.    Whether the district court correctly held that the Commissioners were not entitled to legislative immunity because their retaliatory actions were directed at a single public employee: Chief Acevedo.

## STATEMENT OF THE CASE

Appellee Hubert Arturo Acevedo ("Chief Acevedo") brought this lawsuit to vindicate his whistleblower and First Amendment rights after he was publicly humiliated, suspended, and terminated from his position as Chief of Police for the City of Miami Police Department ("MPD") in retaliation for exposing corruption by City of Miami Commissioners Jose Carollo, Alex Diaz de la Portilla, and Manolo Reyes (the "Commissioners") and by City Manager Arthur Noriega ("Manager Noriega"). Chief Acevedo's claims arise under the Florida Public Whistle-Blower's Act, Fla. Stat. § 112.3187 and the Civil Rights Act of 1866, 42 U.S.C. § 1983.

## STATEMENT OF THE FACTS

In March 2021, Mayor Francis Suarez and Manager Noriega recruited Chief Acevedo to become Chief of Police of the MPD, emphasizing the desire for a chief who could "reform the MPD and change the culture." App. 1 ¶¶ 16–17.[1] On April 5, 2021, Chief Acevedo was sworn in as Chief of Police, *id.* ¶ 18, reporting to Manager Noriega. *Id.* ¶¶ 24–26. Under the City of Miami Charter, no City Commissioner may manage or give direct orders to any department that is subordinate to the City Manager, including the MPD. *Id.*

### Weaponization of the MPD

The Chief's challenges were exposed immediately. Numerous officials, including Manager Noriega, soon brought up Bill Fuller, a Miami businessman and political opponent of Commissioner Carollo. *Id.* ¶¶ 40, 43–46. Chief Acevedo was warned to "stay away" from Mr. Fuller's businesses because patronizing any of his establishments would cause Commissioner Carollo to "go crazy" and unleash his wrath. *Id.* ¶¶ 46–49. From the outset, Chief Acevedo was "concerned that City political leadership, including Manager Noriega and [the Commissioners] were seeking to use the MPD to carry out political vendettas…" *Id.* ¶ 50.

---

[1] Citations to Appellants' Joint Appendix cite the "Docket/Tab #" in the form "App." Citations to the Appellee's Supplemental Appendix cite the "Docket/Tab #" in the form "Supp. App."

His concerns turned out to be well-founded. On April 22, 2021, the Commission held a meeting where Commissioner Carollo and Commissioner Diaz de la Portilla stated that they would provide a list of specific bars and establishments that they wanted Chief Acevedo to investigate. *Id*. ¶¶ 56–64. Manager Noriega gave his permission, saying he would "[o]f course not" have any problems with the Commissioners providing their lists. *Id*. ¶¶ 62–64. When Chief Acevedo received those lists, he questioned whether any citizens had complained about the businesses or whether the businesses were affiliated with the Commissioners' political enemies, because there was no evidence that they had broken any laws. *Id*. ¶¶ 65–69.

Several days later, one of Mr. Fuller's businesses was raided, and it was brought to Chief Acevedo's attention that there were discrepancies in the post-raid reporting. *Id.* ¶¶ 71–72. Chief Acevedo tasked Officer Morales with investigating the discrepancy, though Chief Acevedo later learned that Officer Morales took no action. *Id*. ¶ 73. The MPD conducted two more "unannounced inspections" of Mr. Fuller's business. *Id.* ¶ 79. Commissioner Carollo continued to pressure Chief Acevedo to focus on purported criminal activity at Mr. Fuller's businesses even though Chief Acevedo saw no evidence supporting Commissioner Carollo's accusations. *Id.* ¶¶ 80–84. Uncoincidentally, Officer Morales was later hand-selected to be the Chief of Police to replace Chief Acevedo, because of Officer Morales' loyalty, complicity, and personal relationship with the Commissioners. *Id.* ¶¶ 74–78.

4

In another instance, Commissioner Carollo asked Chief Acevedo to arrest "agitators" and "communists" who were demonstrating against Donald Trump, even though they were not posing any threat to public safety. *Id.* ¶¶ 91–98. Chief Acevedo did not order any arrests, because he saw no evidence that the demonstrators were breaking any laws. *Id.* ¶ 98.

### Undue Pressure and Misuse of the MPD

In addition to these efforts to deploy the MPD as personal enforcers, the Commissioners showed improper favoritism and exerted undue influence over the MPD, despite their lack of authority to manage MPD personnel or investigations. *Id.* ¶¶ 24–26.

For instance, Chief Acevedo ordered internal affairs to investigate an officer who breached security protocol while on duty to provide protection for the Mayor of Miami and the Commissioners. *Id.* ¶¶ 100–106. That officer, Luis Camacho, was relieved of duty with pay. *Id.* ¶ 107. Apparently upset by the outcome of the confidential investigation, the Commissioners raised Officer Camacho's employment status at a Commission meeting, commenting at length about how "disgusting" and "arbitrary" the disciplinary action was. *Id.* ¶¶ 108–118. Privately, they also questioned Chief Acevedo and pressured him to reinstate Officer Camacho as part of their security detail—with Commissioner Diaz de la Portilla even offering to reward

5

Chief Acevedo with political support if he followed through with the reinstatement. *Id.* ¶¶ 119–23.

Chief Acevedo raised his concerns about the Commissioners' pressure campaign to have Officer Camacho reinstated, telling Manager Noriega that he "had never seen politicians interfere in such a manner" in his thirty-five years of law enforcement experience. *Id.* ¶¶ 124–25. He provided details, including Commissioner Diaz de la Portilla's illicit incentive, but Manager Noriega took no action. *Id.* ¶¶ 124–25, 143.

Separately, one of Chief Acevedo's planned reform efforts was to address excessive use of force by MPD police officers. *Id.* ¶¶ 144–46. With the approval of Manager Noriega, to assist in the reform, Chief Acevedo hired officer Heather Morris to be his Deputy Chief and planned to create a new position of Deputy Director of Constitutional Policing. *Id.* ¶¶ 148–51. A month later, the Commission held a meeting where the Commissioners voted to eliminate funding for both positions. *Id.* ¶¶ 152–64. Their actions were suspicious, retaliatory, and not plausibly budgetary, because they did not eliminate the newly-created position of Assistant Chief—which was held by a longtime personal friend of Commissioner Reyes. *Id.*

On September 13, 2021, Chief Acevedo raised these new events with Mayor Suarez and Manager Noriega and reiterated his previous concerns about the Commissioners' interference with and misuse of MPD, specifically complaining that

these were attempts to "intimidate" him and to "pursue their own personal agendas through the MPD." *Id.* ¶¶ 167–69. Manager Noriega dismissed his concerns, saying they were part of doing business in Miami. *Id.* ¶ 169.

On September 23, 2021, the Commission held another hearing where Manager Noriega met with Chief Acevedo and told Chief Acevedo that Commissioner Carollo was angry about an MPD officer being routinely rotated into an internal affairs position. *Id.* ¶¶ 171–73. Manager Noriega disclosed that Commissioner Carollo had "jumped" on him and threatened to "blow up [Chief Acevedo's budget further" if the personnel rotation took place. *Id.*

### The City of Miami Charter and Resolution No. R-20-0034

The City of Miami Charter sets forth the duties of the Chief of the MPD, which includes the "immediate direction and control of the police force" and "the right and power to suspend any of the officers and employees in their respective division …" *Id.* ¶¶ 19–21. It does not include any language enabling the chief to discipline any City of Miami Commissioners. *Id.* ¶ 22. It also prohibits the Commissioners from giving direct orders to "any of the subordinates of the city manager…." *Id.* ¶¶ 24–26. That includes the MPD. *Id.*

Separately, Section 26 of the Charter sets out the process for suspending a police chief, and for adjudicating the charged cause of suspension:

> The city manager *shall have the exclusive right to suspend the chief of police* and fire chief …. If either of such chiefs be so suspended the city

7

> manager *shall forthwith certify the fact, together with the cause of suspension, to the commission* who within five (5) days from the date of receipt of such notice, shall proceed to hear such charges and render judgment thereon, which judgment shall be final.

City of Miami Charter § 26 (emphasis added); *see also* App. 24 at 6.

In February 2020, the Commission passed No. R-20-0034 (the "Resolution"). *Id.* ¶¶ 28–30. The Resolution directed the City Manager to develop a Memorandum of Understanding providing that the Florida Department of Law Enforcement ("FDLE") or the Federal Bureau of Investigation ("FBI") would direct all criminal investigations of City elected officials, excluding those relating to misdemeanors or traffic offenses. *Id.* It further ordered that, until the Memorandum of Understanding was approved by the Commission, the City Manager was to forward any and all pending criminal investigations of City elected officials to the FDLE and/or the FBI. *Id*. Though the stated purpose of the Resolution was to avoid conflicts of interest, its practical effect was to prevent the MPD from investigating the Commissioners and to restrict the employment duties of MPD officers, including Chief Acevedo. *Id.* ¶¶ 31–34.

### The September 24, 2021 Whistleblower Memorandum

As the Commissioners' abuse continued, Chief Acevedo decided to memorialize what he had experienced. On September 24, 2021, Chief Acevedo wrote a whistleblower memorandum (the "Memorandum") and circulated it to Manager Noriega, Mayor Suarez, the Miami-Dade County State Attorney's Office (the "State

Attorney's Office"), and the FBI. *Id*. ¶¶ 174–77. The Memorandum contained many of the details described above, wherein the Commissioners abused their position, weaponized the MPD against political opponents, and intentionally undercut reform efforts. *Id.* ¶¶ 174–183. It also described the Commissioners' personal targeting of Chief Acevedo due to his resistance to their misconduct. *Id*.; App. 25-1. Although Chief Acevedo sent the Memorandum only to Manager Noriega, Mayor Suarez, and law enforcement, within 48 hours, it was leaked to the media. App. 1 ¶ 187.

After receiving the Memorandum, Manager Noriega called Chief Acevedo and essentially said, "So you've gone after them, and better be sure you have a kill shot because if you don't, you better not take it. Maybe it's because you're an outsider it's easier for you. Trust me[.] I came from my last job where I had a hell of a lot more autonomy than I have here, but I realize and accept my limitations." *Id.* ¶ 186.

The Commissioners quickly held two meetings. On September 27, 2021, the Commissioners launched a series of ad hominem character attacks against Chief Acevedo and played videos of him dressed in costume for a fundraiser in an attempt to embarrass him. *Id.* ¶¶ 190, 195. Commissioner Carollo repeated false allegations about Chief Acevedo, which were unrelated to and pre-dated Chief Acevedo's time at the MPD, and compared Chief Acevedo to a convicted felon. *Id.* ¶¶ 192–93, 197. At the end of the meeting, the Commission passed a resolution to investigate *itself* with respect to Chief Acevedo's allegations in the Memorandum, confirming that the

investigation of their actions had been removed from the authority and responsibilities of the MPD and its Chief. *Id*. ¶ 199.

On October 1, 2021, the Commissioners continued their retaliatory attacks. Commissioner Diaz de la Portilla commented that Chief Acevedo was "no reformer" and "was not a Cuban-American from Miami." Commissioner Carollo made statements such as, "Hubert, I've taken on much smarter guys than you and one who thought he could hide behind the badge went to jail." *Id*. ¶¶ 202, 206–07.

On October 11, 2021, Manager Noriega suspended Chief Acevedo. *Id*. ¶ 212. Noriega produced a letter purporting to outline the causes for his termination (the "Suspension Letter"). This Suspension Letter was pretextual, as indicated by Manager's comments to Chief Acevedo. *Id*. ¶¶ 213–15. Manager Noriega said that he "had to stop the bleeding" and that Chief Acevedo had "gone too far." *Id*. ¶ 216. Manager Noriega scheduled the termination hearing on short notice over Chief Acevedo's objection that his attorney could not be present. *Id*. ¶ 218.

On October 14, 2021, that sham termination hearing took place, where the Commissioners were supposed to act as impartial judges about *themselves* and *their* misconduct. Manager Noriega's counsel put on evidence of the cause for Chief Acevedo's suspension, calling four witnesses to testify, including Manager Noriega himself. *Id*. ¶ 220. The Commissioners' animosity towards Chief Acevedo and his counsel were so egregious that non-party Commissioner Ken Russell called attention

to their "bias." *Id.* ¶¶ 221–27. Nevertheless, the Commissioners voted to terminate

Chief Acevedo. *Id.* ¶ 226.

## COURSE OF PROCEEDINGS BELOW

All defendants below moved to dismiss. App. 17, 23–25, 27. Both the Commissioners and Manager Noriega asserted qualified immunity, and the Commissioners also asserted legislative immunity. App. 23–25, 27. The district court denied all defendants' motions to dismiss. App. 75.

The Commissioners and Manager Noriega appealed. The City of Miami did not appeal, as it was not entitled to interlocutory review. As such, the City of Miami is not a party to the appeal, and Chief Acevedo's claim arising under Florida Public Whistle-Blower's Act, Fla. Stat. § 112.3187, directed only at the City, is not at issue in this appeal.

## STANDARD AND SCOPE OF REVIEW

The Court reviews *de novo* the denial of a motion to dismiss based on immunity from suit. *See Crymes v. DeKalb Cty., Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991); *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).

On review of an order on a motion to dismiss, all factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *See Keating*, 598 F.3d at 762.

## SUMMARY OF THE ARGUMENT

Chief Acevedo met his burden to show that qualified immunity was not appropriate because (1) he pleaded a plausible claim that the Commissioners and Manager Noriega violated his federal rights and (2) precedent in this Circuit clearly established those rights. Chief Acevedo addresses the "merits" prong and "immunity" prongs in the same order as the district court, beginning with how Chief Acevedo pleaded a violation of his First Amendment rights.

First, Chief Acevedo spoke as a private citizen when he circulated his Memorandum, because the Resolution removed the investigation of City officials from the job duties of the MPD and mandated referrals to the FDLE and the FBI. Chief Acevedo had "no choice" but to speak as a private citizen, because the Resolution took the alleged corruption out of his professional purview and job duties. The Commissioners argue that Chief Acevedo had an implied duty to report corruption that was inherent to his role and responsibilities as Police Chief. Their theory has been tried, and rejected, by binding authority, because adopting this principle would make it impossible for certain law enforcement officers or high-ranking public officials to whistleblow on corruption.

Second, Chief Acevedo spoke on a matter of public concern. His Memorandum detailed the Commissioners' misuse of the MPD to target political enemies or protect individuals with whom they had personal relationships. It also

14

described the Commissioners' intentional efforts to sabotage Chief Acevedo's leadership team and reform efforts. Courts have consistently found that government corruption is of the highest public importance, and likewise Chief's Acevedo's attempt to rectify a pattern of excessive use of force was of particular interest in the context of the national discussion on police reform.

Third, his speech satisfied the *Pickering* balancing test, because his interest in exposing corruption and exercising his First Amendment rights outweighed any interest the City could have had in terminating him. The Complaint contains no allegations—and gives rise to no reasonable inferences—that his speech disrupted or impeded City or MPD functions. To the contrary, his goal was the opposite: to protect the MPD officers and promote the rule of law for all City citizens. That is why he sent the Memorandum only to those who would have authority to take action.

Based on the four corners of his Complaint, Chief Acevedo stated a claim that the Commissioners and Manager Noriega violated his First Amendment rights by satisfying the factors above. Nevertheless, they urge this Court to ignore or doubt the veracity of Chief Acevedo's allegations. They also urge the Court to rely on the pretextual Suspension Letter, which was written by Manager Noriega. Their attempt to expand the scope of analysis beyond Chief Acevedo's allegations and Memorandum must be rejected as procedurally improper.

The Commissioners' arguments on qualified immunity fail for the same reasons. Rather than focusing on the "immunity prong," they recycle their arguments from the "merits prong," insisting that Chief Acevedo's speech was not entitled to First Amendment protection anyways. They do not provide any authority that justifies upending the district court's well-reasoned and thorough review of the case law related to the "clearly established" right the Commissioners violated. The Commissioners had fair warning that it was unconstitutional to fire a government employee whistleblowing on corruption. *Garcetti*, *Pickering*, and a litany of opinions from this Circuit confirm that Chief Acevedo's entitlement to First Amendment protection was "clearly established." Commissioner Carollo himself was a whistleblower who availed himself of this First Amendment protection in one such opinion from this Court. Given the consensus clearly establishing Chief Acevedo's right, there is no legal error in the district court's order denying qualified immunity.

Manager Noriega filed separately to raise two arguments that he believes distinguishes him from the Commissioners. Neither is availing. First, there is no question that the City Charter empowered Manager Noriega *exclusively* to suspend the police chief. He was therefore the final decisionmaker with respect to that adverse employment action. Second, Chief Acevedo need not show that there was binding precedent holding that "temporary suspension with pay, subject to an

16

evidentiary hearing and determination by the full Commission" constituted an adverse action. Rather, this Circuit recognizes a variety of retaliatory employment actions, and a suspension that would deter other reasonable governmental employees from exercising their First Amendment rights constitutes such an action. Therefore, like the Commissioners, Manager Noriega was on notice that his decision to suspend Chief Acevedo would violate his First Amendment rights.

Finally, the Commissioners are not entitled to legislative immunity, because their actionable conduct was not legislative in nature. It was targeted specifically at Chief Acevedo, not the public at large, and thus it was "administrative" and not covered by legislative immunity.

17

# **ARGUMENT**

## I.    **Chief Acevedo satisfied both prongs of the qualified immunity analysis.**

The district court properly denied the motions to dismiss, because Chief Acevedo's pleading satisfied both prongs of the qualified immunity analysis. To meet his burden, "a plaintiff must establish that (1) his complaint pleads a plausible claim that the defendant violated his federal rights (the 'merits' prong), and that (2) precedent in this Circuit at the time of the alleged violation 'clearly established' those rights (the 'immunity' prong). *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016), *abrogated on other grounds by Gilmore v. Georgia Dep't of Corr.*, 111 F.4th 1118 (11th Cir. 2024). Though courts may address the prongs in either order, *id.*, Chief Acevedo presents the "merits prong" argument first, as that is the analysis the district court undertook first. *See* App. 75.

## II.    **Chief Acevedo's speech was protected by the First Amendment.**

To establish a First Amendment retaliation claim, an employee must make three showings. "First, the employee must show that the speech was made as a citizen on a matter of public concern. Second, the employee's free speech interest must outweigh the employer's interest in effective and efficient fulfillment of its responsibilities. And third, the speech must have played a substantial part in the adverse employment action." *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) (citations omitted); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318

(11th Cir. 2005). "If an employee satisfies [his] burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Cook*, 414 F.3d at 1318.

The district court accurately noted that the first two parts are questions of law, and the last two parts are questions of fact, App. 75 at 11 n.4 (citing *Boyce v. Andrew*, 510 F.3d 1333, 1342 n. 12 (11th Cir. 2007)), and that any attempt to "jump ahead to the fourth prong" was premature, because there "is no 'preponderance of the evidence' in the record at this [motion to dismiss] stage that would allow [the Commissioners] to fulfill [their] burden to show that [they] would have made the same decision in the absence of [Chief Acevedo's] protected speech." *Id.* at 27; *see also Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015). Thus, there is no reason for this Court to revisit the district court's well-founded legal rulings because of procedurally-improper factual challenges.

### A. Chief Acevedo spoke as a private citizen.

In determining whether a public employee spoke as a private citizen, courts ask whether the speech "owes its existence to [the] employee's professional responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (1951)). Speech "owes its existence" to the public employee's professional responsibilities if the employer "commissioned or created" the speech. *Id.* As the Supreme Court has explained, "the

19

mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Instead, the court's determination turns on "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

### 1. Chief Acevedo's Memorandum was protected speech because of the Resolution.

The district court rightly found that Chief Acevedo spoke as a private citizen because the Resolution removed the responsibility of investigating and reporting misconduct by City officials from the scope of Chief Acevedo's job responsibilities. App. 75 at 11–15. The Resolution was passed on February 13, 2020, before Chief Acevedo was sworn into office. App. 1 ¶ 28.

The Resolution directed the City Manager to develop a Memorandum of Understanding under which the FDLE or the FBI would direct all criminal investigations of City elected officials. *Id.* ¶ 29. The resolution further provided that, until the Commission approved the MOU, the *City Manager* was to forward any and all pending criminal investigations of City elected officials to the FDLE and/or the FBI. *Id.* The City of Miami and the Commissioners were well aware of the mechanics of the Resolution and even asked the district judge to take notice of its language. *See* Supp. App. 41.

20

As alleged, the Resolution put Chief Acevedo in a "dilemma." App. 1 ¶ 34. By operation of the Resolution, his duties as Chief of Police of the MPD specifically excluded investigating or reporting on City of Miami elected officials. Any investigation was to be "handled" by other law enforcement, and any reporting to those law enforcement agencies was to be done by Manager Noriega. *Id.* ¶ 28. As a practical matter, this put City elected officials beyond the jurisdiction of the MPD and its Chief.

### 2. Chief Acevedo's writing and circulation of his Memorandum was outside the scope of his ordinary job duties.

The Commissioners try to circumvent the plain language and effect of the Resolution in two ways. First, they argue that the Resolution left intact Chief Acevedo's obligation to "report" misconduct even if he could not "handle" it. And second, they imply that, even if Chief Acevedo could have no active role in the investigation, his position as Police Chief created a limitless *per se* obligation to report any and all crime. Brief[2] at 28–31. Neither of these arguments is meritorious.

The first argument is highly semantic and ignores practicality. The Commissioners insist on literal reading of the Resolution, arguing that Chief Acevedo was prevented only from "handling" investigations but not from reporting

---

[2] Citations to the "Brief" refer to the Commissioners' Initial Brief (Document 60). Citations to "Noriega's Brief" refer to Manager Noriega's Initial Brief (Document 59).

issues for further investigation. Brief at 6, 21, 30. But if Chief Acevedo and the MPD could not "handle" any investigations for avoidance of conflict, and Manager Noriega was to "forward" investigations for the FDLE and/or FBI to undertake, then there were no duties left within Chief Acevedo's professional responsibilities. There was no conflict, however, in a private citizen speaking out against elected officials—and that is what he did.

Next, there is no merit to the Commissioners' argument that Chief Acevedo's Memorandum constituted speech that his "employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421–22. Chief Acevedo's duties under the City Charter encompassed "immediate direction and control of the police force." App. 1 ¶ 20. The Resolution removed the MPD's authority to investigate the Commissioners, and so Chief Acevedo could not direct or control his police force in such matters. The Commissioners, however, argue that his Chief of Police duties were boundless with respect to any and all criminal activities, because he was "the City of Miami's highest law enforcement officer." Brief at 30. As a result of Chief Acevedo's public stature, they insist that reporting corruption and misconduct was an implicit responsibility. This premise has been rejected by the Supreme Court and this Circuit, as it would vitiate First Amendment rights for any high-level government official—creating a subclass who can never avail themselves to whistleblower protection because they are silently, but endlessly, duty-bound to

22

report misconduct of all forms. *See Carollo*, 833 F.3d at 1330–32 (analyzing *Lane,* 573 U.S. at 241–42, to hold that the "suggested implied duty would eviscerate the role of the First Amendment in protecting public employees who act as whistleblowers").

The *Carollo* court also rejected the related argument that any "reports to law enforcement and other agencies were necessarily pursuant to his job" as a high-ranking government official with administrative oversight. *Id.* at 1330. There, Commissioner Carollo was the City Manager of Doral, endowed with similarly high-level access and authority in City Hall. Nevertheless, this Court found that *Lane* "expressly rejected" the theory that Carollo's whistleblowing was encompassed by his vast responsibilities, because expanding the scope of a public employee in such a way would make it impossible for them to expose corruption without recourse. *Id.*; *see also Lane*, 573 U.S. at 240–41 ("speech by public employees regarding information learned through their employment" is entitled to protection when it is "the very kind of speech necessary to prosecute corruption by public officials").

Accordingly, Chief Acevedo alleged that his writing and sending of the Memorandum was not ordinarily within the scope of his express job duties as Police Chief, and any expansion of his express duties would violate the principles articulated in *Lane* and *Carollo*.

### 3. Even Manager Noriega acknowledged Chief Acevedo's speech was outside his ordinary responsibilities.

In addition to the legal effect of the Resolution, the Complaint cannot be plausibly read to allege that Chief Acevedo was merely reporting about regular operations. The Memorandum indicates that it had been sent to the United States Department of Justice and the FBI, not just to Mayor Suarez and Manager Noriega. App. 25-1 at 8. Upon receiving the Memorandum, Noriega called Chief Acevedo and said, "So you've gone after them, and better be sure you have a kill shot because if you don't, you better not take it. Maybe it's because you're an outsider it's easier for you." App. 1 ¶ 186 (emphasis added).

Taking these allegations as true, as is required, Noriega's reaction implicitly acknowledged that Chief Acevedo was acting as a private citizen and as an "outsider" seeking to expose misconduct at the highest levels of City government—not as the Chief of Police telling the City Manager about ordinary City business. And surely Chief Acevedo would not have sent the Memorandum to the State Attorney's Office and the FBI as a matter of routine. In similar circumstances, this Court has noted that a former officer who provided a sworn statement to the FDLE in connection with its investigation into corruption by the local police chief and his staff "wasn't simply performing … her job duties," since the FDLE "was not her employer" but a "distinct law-enforcement agency of the State of Florida." *Gomez*

24

*v. City of Doral*, No. 21-11093, 2022 WL 19201, at *6 (11th Cir. Jan. 3, 2022) (per curiam).

The district court correctly construed the allegations in the light most favorable to Chief Acevedo when it found that, "[i]t was City Manager Noriega's duty to report commissioner misconduct, not [Chief Acevedo's], which is why [Chief Acevedo's] Memorandum reporting misconduct was outside his ordinary duties." App. 75 at 13. There is no reason for this Court to interpret the effects of the Resolution differently. This is especially true when this Court has previously held that "speech that owes its existence to a public employee's professional responsibilities must be read *narrowly* to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of [his] employment, not merely speech that *concerns* the ordinary responsibilities of [his] employment." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1162 (11th Cir. 2015) (cleaned up) (emphasis added).

### 4. The Commissioners can point to no authority that justifies a different legal finding.

The Commissioners' authority provides no reason to find legal error. In *Batz v. City of Sebring*, 794 F. App'x 889 (11th Cir. 2019), the fire chief's speech complained about "interference with his enforcement-related job duties." *Id.* at 900. The Commissioners build a strawman out of Chief Acevedo's use of the word "interference" in order to analogize it to the *Batz* chief's objection to "attempts to

25

undermine and delay his efforts to enforce the Safety Code. …" Brief at 26–27 (citing *Batz*, 794 F. App'x at 898). But the Memorandum went far beyond identifying obstacles to his and the MPD's ability to conduct regular law enforcement activities. It sought to expose corruption and the misuse of the MPD to advance the Commissioners' personal and political agendas. For that same reason, the Commissioners' reliance on *King v. Bd. Of Cnty. Commissioners*, 916 F.3d 1339 (11th Cir. 2019), is also inapposite. That plaintiff's speech was found to be made "pursuant to her job duties" because she complained about a specific firefighter's fitness for duty, when her job responsibilities included making medical determinations of fitness for duty. *Id.* at 1346.

Reliance on *Carollo*, 833 F.3d 1322, is no more persuasive. Though the Commissioners note that some of then-city manager Carollo's speech was not protected, his speech blowing the whistle on the City of Doral's commissioners' violations of campaign finance laws was. *Id.* at 1330–31. Moreover, the Court noted that "[i]t is not appropriate at the motion to dismiss stage for us to interpret the Municipal Charter's ambiguous job description," because "[d]iscovery will illuminate exactly which laws [plaintiff] had the responsibility to enforce or administer and, in fact, enforced or administered in the ordinary course of his job responsibilities." *Id.* at 1330.

26

Likewise, "the only question before [the Court]" is whether it is "plausible under *Iqbal* and *Twombly*" that Chief Acevedo "spoke as a citizen and not pursuant to his ordinary job duties … when he made statements to law enforcement and other agencies." *Id.* Nothing on the face of Chief Acevedo's Complaint indicates that it was within his responsibilities to expose corruption and abuse of power by elected officials; his allegations about the Resolution established the opposite. The Commissioners' attempt to inject ambiguity into the Complaint must be rejected as a factual dispute not appropriately addressed at this stage. *Id.*

In short, the Commissioners downplay the content of the Memorandum and improperly expand the scope of Chief Acevedo's responsibilities. But none of their authority justifies an outcome different from the district court's.

### B. Chief Acevedo spoke on matters of public concern.

"To fall within the realm of public concern, an employee's speech must relate to any matter of political, social, or other concern to the community." *Gomez*, 2022 WL 19201, at *6 (cleaned up); *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (same). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). In this Circuit, the "most important factor" is the content of the speech. *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1284 (11th Cir. 2006).

Chief Acevedo's Memorandum detailed multiple instances of misconduct, particularly those relating to government corruption and police reform. Courts rightly find that these are topics of public concern.

### 1. Chief Acevedo's speech concerned corruption.

As the Supreme Court has recognized, "exposing governmental ... misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425. "[A] core concern of the first amendment is the protection of the 'whistleblower' attempting to expose government corruption." *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989); *see also Lane*, 573 U.S. at 241. Chief Acevedo's speech addressed exactly this topic: corruption in City government by its elected officials and its Manager. He aptly titled his Memorandum, "RECENT ACTIVITIES BY CITY OFFICIALS." App. 1 ¶ 179.

Specifically, Chief Acevedo's Memorandum "outlined how the Defendant Commissioners had attempted to weaponize the MPD, interfered with MPD internal and external investigations, and impeded reform at the MPD." *Id.* ¶ 180. As the activities described in the Memorandum overlap significantly with the events in the Complaint, the Memorandum itself is replete with details about the alleged corruption. *See* App. 25-1 at 3–4, 7. It paints the undeniable picture that the Commissioners abused their power and sought to impose undue pressure on political enemies and City officials, including Chief Acevedo. Chief Acevedo alleged that

28

these actions, among many others detailed in his Complaint, violated federal and state law and the City of Miami Charter. App. 1 at 6, 23–24 ¶¶ 35, 174–83. Put simply, the Memorandum constitutes speech exposing corruption.

### 2. Chief Acevedo's speech concerned police reform.

Chief Acevedo's Memorandum also addressed "a pattern of unlawful use of force by officers, and in some instances[,] the chain of command has covered up the unlawful use of force by some officers." App. 25-1 at 5. In writing the Memorandum, Chief Acevedo spoke out against excessive force and the Commissioners' attempts to impede reform of improper policing practices.

This Court has found that speech concerning "whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political and social concern." *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996). This alone justifies the district court's holding that Chief Acevedo's speech was a matter of public concern—especially because it was made in 2021, during a time in which public interest in excessive force and police reform was paramount. *See* App. 75 at 17-18 (citing *Akeem Fuller, v. Warren Cty. Educ. Serv. Ctr.*, No. 21-CV-451, 2022 WL 445815, at *5 (S.D. Ohio Feb. 14, 2022).

### 3. Chief Acevedo's speech was neither administrative nor self-interested.

The Commissioners do not, because they cannot, deny that government corruption and excessive use of police force are matters of public interest. Instead,

29

they attempt to misconstrue the Memorandum as a complaint about managerial interference meant to promote Chief Acevedo's personal interests.

First, ignoring the content of the Memorandum as a whole, they myopically argue that the words "corruption" and "unlawful use of force" appear in only one paragraph each, and therefore the thrust of the Memorandum was to preserve his employment rather than blow the whistle. Brief at 33–34. Chief Acevedo describes both public and private confrontations with the Commissioners, where they pressured him to deploy MPD resources to investigate a list of political enemies and offered to support his campaign for sheriff if he would reinstate one of their favored officers. App. 25-1 at 3–4, 6–8.

Given the scope of the corruption, Chief Acevedo concluded that the "MPD and the City has no choice" but to involve the FBI and the United States Department of Justice in "unraveling" the web of personal conflicts and connections that the Commissioners were advancing through their abuses. *Id.* at 8. While these statements may not repeatedly use the word "corruption," the content of the Memorandum cannot be characterized as anything but an attempt to blow the whistle on the Commissioners' misuse of the MPD to corruptly advance their own agendas. *See King*, 916 F.3d at 1347 ("In reviewing the whole record, [w]e ask whether the main thrust of the speech in question is essentially public in nature or private") (citation omitted).

30

Next, the Commissioners argue that the Memorandum was a mere report to his superiors about interference "with the police department's resources and investigations," its budget, and its staffing. Brief at 33–34. This is yet another intentionally obtuse reading of Chief Acevedo's allegations. *See supra* Section II.A. Corruption, police weaponization, and abuse of power are not routine job issues, and even if they were, the Resolution took their investigation and prosecution out of his job functions.

Finally, the Commissioners argue that the private forum and the limited audience of the Memorandum demonstrates its thrust was not to address a topic of public concern. But "[p]ublic dissemination is not, however, necessary for speech to be on a matter of public concern." *Rodin v. City of Coral Springs*, 229 F. App'x 849, 856–57 (11th Cir. 2007). Courts have only found lack of public dissemination "significant" where that lack of public dissemination "confirmed the speaker's purely private motivation." *Id.* In *Gomez,* for example, this Court differentiated between the fired detective's personal grievances with the police chief, which were "administrative in nature" and the detective's providing the FDLE with "information about alleged criminal activity involving the Chief of Police and certain members of his command staff," which addressed matters of public concern. 2022 WL 19201, at *6. In contrast, Chief Acevedo's Memorandum did not discuss his personality conflicts or his general inability to operate the MPD with the budget and staffing

31

provided by the Commissioners. Chief Acevedo believed that he had "no choice" but to expose the misconduct and—as reiterated throughout the Memorandum—that he needed to "memorialize and report [the misconduct] because the men and women of the MPD, and the wonderful community we serve, deserve leadership that is committed to the rule of law." App. 25-1 at 8.

Given this, the Commissioners' argument that Chief Acevedo spoke in pure self-interest is directly contradicted by his allegations, which must be construed as true, in the light most favorable to him.

### C. The district court rightly found that Chief Acevedo's interest outweighed the City's interest under the *Pickering* balancing test.

Because Chief Acevedo spoke as a private citizen on a matter of public concern, this Court next "balance[s] . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). When conducting the *Pickering* balancing test, courts consider several factors, "including (1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Belyeu v. Coosa Cty. Bd. of Educ.*, 998 F.2d 925, 928 (11th Cir. 1993) (cleaned up). Other considerations are "[4] whether the statement impairs discipline by superiors or harmony among co-workers, [5] has a detrimental impact

32

on close working relationships for which personal loyalty and confidence are necessary, or [6] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Stough v. Gallagher*, 967 F.2d 1523, 1528 (11th Cir. 1992) (internal citations and quotations omitted) (numeration added).

### 1. Chief Acevedo's interest in his free speech outweighed the City's interests.

Chief Acevedo has a substantial interest in free speech. He "prepared and circulated a whistle-blowing memorandum," exposing multiple instances of public corruption and abuse of power by the Commissioners. App. 1 ¶ 176. This Court has observed that very nature of Chief Acevedo's speech—whistleblowing on public corruption—is among the highest levels of interest. *See Bryson*, 888 F.2d at 1566; *see also Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1564 (11th Cir. 1995) ("It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens."). The City's interests cannot tip the balance out of Chief Acevedo's favor.

First, Chief Acevedo's speech sought to promote and protect the interest of the MPD and the citizens of Miami—not to impede the City's interest in providing efficient public services like law enforcement. *See* App. 25-1 at 8 ("[M]y sworn duty is to uphold the rule of law … and to work for the wellbeing of the men and women and lawful independence of MPD and the people of Miami."); App. 1 ¶ 271 (alleging

33

that the Memorandum did "not disrupt the functioning of the MPD or the City of Miami" and that "the MPD and the City of Miami continued to function after its publication").

Second, Chief Acevedo spoke in an appropriate "manner, time and place" so as to minimize the risk of compromising the public's view of the MPD and thereby impeding its ability to operate efficiently. *Id.* ¶¶ 177, 271 (alleging that the "Memorandum was published (to a limited group of persons)," specifically, the "City Manager Noriega, Mayor Suarez, the Miami-Dade State Attorney's Office, and the FBI").

Third, the Memorandum was written and released in an appropriate and pertinent "context"—*i.e.*, in connection with Chief Acevedo's discovery of corruption and abuse of power that the Resolution took outside of his official responsibilities and jurisdiction. *Id.* ¶¶ 174–75.

Fourth, the Commissioners can point to no allegations that the Memorandum "impair[ed] discipline by superiors or harmony among co-workers," or that his circulation of the Memorandum "ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary" or "impede[d] the performance of the speaker's duties or interferes with the regular operation of" the MPD. *See Stough*, 967 F.2d at 1528.

34

When limited to the Complaint and the Memorandum, none of the factors go the Commissioners' way. Accordingly, the district court accurately applied the *Pickering* factors and held that Chief Acevedo's interests prevailed.

### 2. Chief Acevedo's speech was not administrative or policy-oriented.

The Commissioners argue that Chief Acevedo's First Amendment rights are "often slight" because, as Chief of Police, he was in a policymaking role. Brief at 38 (citing *Bates v. Hunt*, 3 F.3d 374 (11th Cir. 1993)). Their reliance on *Bates* is misplaced from the outset, as *Bates* is both factually and procedurally distinguishable.

*Bates* made clear that the determination "whether a governmental employer has improperly infringed on an employee's First Amendment rights turns on the specific facts of the particular case" and that a "'case-by-case' analysis is required." *Bates*, 3 F.3d at 378. There is no categorical relinquishment of First Amendment interests simply because Chief Acevedo may have developed and implemented certain policies. *Bates* involved a lawsuit by a Governor's administrative assistant, who alleged that her First Amendment rights were violated because she was fired when she "voluntarily gave [a plaintiff] an affidavit to support" another public employee's lawsuit against the Governor. *Id.* at 375–76. The only factor the Court considered when determining Bates' speech was unprotected was that "the essence of Bates's job was to speak and to act as a delegate of the Governor to his

35

constituents," and *Pickering* "does not require the Governor to delegate that authority to someone who has *voluntarily* aided a civil lawsuit ... and, thereby, has demonstrated hostility to him." *Id.* at 378 (emphasis in original). In recognition of the fact-specific nature of this analysis, it found that, "[i]n *these* circumstances, at least, the governor of a state is not required to let his adversaries represent him." *Id.* (emphasis in original).

In contrast, the "essence" of Chief Acevedo's job was not political. It was to be Chief of Police. His protected speech was also not the "extremely hostile act" of aiding in a lawsuit against any of the underlying defendants. *Id.* at 378. It was writing and circulating the Memorandum—the content of which, as described above, was not administrative or confined to the ordinary responsibilities of Chief of Police.

The Commissioners argue that they were allowed to terminate Chief Acevedo quickly, without allowing an evidentiary "record" to develop wherein they could show that the "rank-and-file officers" were influenced. Brief at 41. But again, they can point to no allegations that the Memorandum threatened the "heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department." *See Moss*, 782 F.3d at 621 (citations omitted). To the contrary, Chief Acevedo made it clear that the purpose of his speech was to protect the interests of the MPD. App. 25-1 at 8.

The procedural impropriety must be noted. The Commissioners' attempt to dispute his motives or to imply that the Memorandum had negative repercussions is premature. Both *Bates* and *Moss* addressed rulings at the summary-judgment stage. At that point, the Commissioners may attempt to undermine the allegations with their own evidence. But here, Chief Acevedo's allegations must be accepted as true, with all reasonable inferences drawn in his favor. *See Keating*, 598 F.3d at 762. Within that framework, the district court correctly found that the *Pickering* balancing tilted in Chief Acevedo's favor.

### D. Chief Acevedo pleaded the causation between his speech and the adverse employment actions directed at him.

Finally, Chief Acevedo adequately pleaded that his speech "played a substantial part in the adverse employment actions" directed at him. *Cook*, 414 F.3d at 1318. Unlike the first two steps of the First Amendment analysis, this "third stage of the analysis" is a question of fact to be resolved by a jury "unless the evidence is undisputed." *See Moss*, 782 F.3d at 618; *Boyce*, 510 F.3d at 1342 n. 12; *Kang v. Mayor & Alderman of City of Savannah*, No. 24-12136, 2025 WL 753376, at *3 (11th Cir. Mar. 10, 2025).

"To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1300 (11th Cir. 2005) (internal citations and quotations omitted). "[A]s a matter of law, important

37

conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands." *Id.*

A "plaintiff's burden" to show causation between the speech and the adverse employment actions "is not a heavy one." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291–92 (11th Cir. 2000). "[T]he 'substantial part' standard can be satisfied by close temporal proximity between the protected speech and the adverse employment action." *Speak v. Whidden*, No. 2:18-CV-826-JLB-NPM, 2021 WL 765467, at *14 (M.D. Fla. Feb. 26, 2021); *Akins*, 420 F.3d at 1305 (a proximity of ten months qualified as "close temporal proximity" for the causation purposes).

### 1. Chief Acevedo alleged multiple adverse employment actions that followed closely after the circulation of his Memorandum.

Chief Acevedo alleged that he was publicly humiliated and reprimanded; suspended by the City Manager; and subsequently terminated from his role as Chief of Police. Each of these involve important conditions of employment, or employment itself, and each took place in close proximity to his protected speech. *Akins*, 420 F.3d at 1300, 1305.

Specifically, after he sent the Memorandum on September 24, the Commissioners held meetings on September 27 and October 1—just three days and seven days, respectively, after his speech. At the first of those public meetings, the Commissioners "launched a series of ad hominem character attacks" and attempted to humiliate him by repeating false allegations and comparing him to a convicted

38

felon. App. 1 ¶¶ 190–97. At the October 1 meeting, the Commissioners continued their personal attacks, commenting that he was "no reformer" and "was not a Cuban-American from Miami," and that "smarter guys" than him have gone to jail. *Id*. ¶¶ 202, 206–07. Allegations about these personal attacks, made in a public forum shortly after he released his Memorandum, sufficiently pleaded an adverse action of reprimand and humiliation.

Chief Acevedo also pleaded that Manager Noriega suspended him on October 11, seventeen days after his Memorandum. *Id*. ¶ 212. He alleges that the Suspension Letter provided by Manager Noriega was pretextual and that City Manager Noriega suspended him because of his speech and because the Commissioners were putting "pressure" on Noriega. *Id*. ¶¶ 213–15. Manager Noriega also told Chief Acevedo that he "had to stop the bleeding" and that Chief Acevedo had "gone too far." *Id*. ¶ 216.

Finally, the Commissioners voted to terminate Chief Acevedo on October 14, 2021, twenty days after his Memorandum. *Id.* at 30 ¶ 226. The vote proceeded a termination hearing where the Commissioners, who were supposed to act as impartial judges in a hearing about *themselves*, were called out by the non-party Commissioners for "simply taking the bait to show [their] bias." *Id.* ¶¶ 221–24.

The allegations surrounding each of these adverse actions are enough to establish causation at this stage. *See Akins*, 420 F.3d at 1305; *Willingham v. City of*

*Valparaiso, Fla.*, 97 F. Supp. 3d 1345, 1358 (N.D. Fla. 2015) ("[C]lose temporal proximity between the protected speech and adverse employment action constitutes circumstantial evidence of causation."), *aff'd*, 638 F. App'x 903 (11th Cir. 2016).

### 2. Any mixed-motive inquiry is premature.

The Commissioners argue that they had mixed motives for voting to terminate Chief Acevedo, which somehow severs the causal link between his Memorandum and the adverse employment actions. Brief at 48. They also contend that the mixed motives entitle them to qualified immunity. *Id.* at 48–49. At this stage, however, the inquiry into the Commissioners' defenses is premature and improper.

What motivated a defendant is a fact-specific inquiry, not appropriate for summary-judgment let alone the pleading stage. *See Foy v. Holston*, 94 F.3d 1528, 1534–35 (11th Cir. 1996); *see also Stanley*, 219 F.3d at 1296 (noting that "the record" must "undisputably establish [] that the defendant in fact was motivated, at least in part, by lawful considerations" for a defendant to be entitled to qualified immunity at the summary-judgment stage); *see generally Bogle v. McClure*, 332 F.3d 1347, 1356 (11th Cir. 2003) (rejecting qualified immunity defense at the summary-judgment stage because of a lack of "record evidence" to "indicate that [defendants] were in fact motivated, at least in part, by objectively valid reasons").

The Commissioners do not dispute the significance of this procedural stage, admitting that the "mixed-motive analysis is often applied in the context of summary

40

judgment." Brief at 52. But the Commissioners believe that this case presents an exception because "the pleadings establish a legal motivation." Brief at 52. The Commissioners are wrong, factually and procedurally.

Factually, the Complaint alleges no facts from which one could reasonably infer that any of the Commissioners acted pursuant to a lawful motivation. To the contrary, Chief Acevedo alleged that he faced retaliation because he reported misconduct to Noriega, Suarez, the State Attorney's Office, and the FBI. *See supra* Section II.D.1. The Commissioners believe certain allegations demonstrate their "disgust[] with his performance" as police chief, *see* Brief at 51, but those allegations are more reasonably construed as the Commissioners having disdain for their ethical norms and anyone who seeks to hold them to account. Moreover, Chief Acevedo sued the majority (three of five) of the Commission, and so his allegations about the Commissioners' motivations are sufficient to allege that the vote to terminate him was improper retaliation. In any event, any valid motivations the two non-party Commissioners may have had (none of which are alleged) do not speak to the Commissioners' individual motivations.

Procedurally, the district court aptly recognized that they attempted to "jump ahead to the fourth prong of the First Amendment retaliation test," which asks whether the employer can "show by a preponderance of the evidence that it would have made the same decision even in the absence of protected speech." App. 75 at

41

27 (quoting *Cook*, 414 F.3d at 1318). There is no record evidence at this stage, and thus the inquiry should end there. In the absence of allegations *supporting* a valid motivation for Chief Acevedo's termination, the Commissioners' argument fails. *See Concordia v. Bendekovic,* 693 F.2d 1073, 1075 (11th Cir. 1982) (affirmative defenses may be addressed at the motion-to-dismiss stage, when the elements of the defense can be assessed by the allegations in the complaint).

### 3. The Appellants cannot rely on the Suspension Letter.

The Commissioners and Manager Noriega attempt to cast doubt onto the Complaint's allegations about retaliatory motive and causation by insisting that Noriega's Suspension Letter must also be taken as true and incorporated into Chief Acevedo's allegations. The Suspension Letter is repeatedly cited in the Commissioners' and Manager Noriega's briefs, most prominently as evidence of mixed motivation. The Appellants insist that the content of the Suspension Letter must be elevated alongside Chief Acevedo's allegations in the Complaint and Memorandum, because of the "incorporation by reference" doctrine. Brief at 13 n.3, 16 n.4; Noriega Brief at 4 n.3. But reliance on the Suspension Letter is procedurally barred.

"Under the doctrine of incorporation by reference, we may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity." *Hi-Tech Pharms., Inc.*

*v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018) (cleaned up). This Court has "held that a document is central to a complaint when it is a necessary part of [the plaintiff's] effort to make out a claim." *Basson v. Mortg. Elec. Registration Sys., Inc.*, 741 F. App'x 770, 771 (11th Cir. 2018) (cleaned up).

Chief Acevedo did not rely on the Suspension Letter as a truthful document to "make out a claim." Instead, he alleged that the Suspension Letter was pretextual—and therefore entitled to no credit whatsoever. On the other hand, the Memorandum is central to his First Amendment claim, and the Complaint mirrors the allegations stated therein. As such, the Court should reject Appellants' request that the Court credit the contents of the Suspension Letter and the related sham termination hearing, as it is another improper invitation to delve into evidentiary issues and factual determinations at the pleadings stage. *Keating*, 598 F.3d at 762.

### III. The Commissioners are not entitled to dismissal on qualified immunity grounds.

The district court marshaled authority and found that the Commissioners were not entitled to dismissal on qualified immunity grounds. Because Chief Acevedo did not dispute that the Commissioners were acting within their scope of discretionary authority when the wrongful act occurred, Chief Acevedo bore the burden of showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Echols v.*

*Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)).

In this Circuit, Chief Acevedo can satisfy his burden in three ways. "He can either (1) come forward with 'case law with indistinguishable facts clearly establishing the constitutional right,' (2) point to 'a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right,' or (3) show that officials engaged in 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323–24 (11th Cir. 2024) (quoting *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021)), *cert. denied sub nom. Moats v. Jarrard*, No. 24-887, 2025 WL 1426679 (U.S. May 19, 2025).

Under the "second broad-principle category," plaintiffs may carry their burden by pointing the court to "case law [that] has sufficiently established a constitutional right that every reasonable officer would know [and that] his conduct was unlawful despite the fact that we hadn't yet applied the principle to the specific facts of his case." *Id.* In analyzing precedent, the court does not "parse out whether any of those cases involved indistinguishable facts or circumstances" before denying a qualified immunity defense. *Id.* (analyzing *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233 (11th Cir. 2024)). Rather, a plaintiff is able to show that the "principle [was] clearly established because we had affirmed it in a variety of situations." *Id.* (internal

citations omitted). This Court also continues to acknowledge that a "plaintiff could still bear his burden by showing a material similar case would give notice." *Id.* at n.18 (internal citations omitted).

### A. Chief Acevedo pleaded a plausible claim that the Commissioners violated his First Amendment rights.

For the "merits" prong of the qualified immunity analysis, Chief Acevedo incorporates Section II *supra*, which establishes that he adequately pleaded facts establishing a violation of his First Amendment rights. He turns now to the "immunity prong." *See Carollo*, 833 F.3d at 1328.

### B. Courts have articulated a broad statement of principle that gave the Commissioners fair notice of Chief Acevedo's constitutional right.

The Commissioners were or should have been on notice of his First Amendment right, because it was clearly established at the time they took adverse employment actions against him. Indeed, Commissioner Carollo himself was the plaintiff-whistleblower in another lawsuit, where this Court found that the defendants had fair notice of his First Amendment rights.

In *Carollo v. Boria*, Commissioner Carollo asserted whistleblower protection after the city council voted to terminate him as city manager. 833 F.3d at 1335. "During his tenure as City Manager, Carollo 'reported to local and federal agencies violations of state and [f]ederal law' by the appellants 'that were personally communicated to him,' and 'made public disclosures' at City Council meetings about

45

those violations." *Id.* at 1326. Carollo sued the members who voted to terminate him. *Id.* Like Chief Acevedo, Carollo asserted First Amendment retaliation. *Id.* at 1327. The district court denied the councilmember's motion to dismiss on qualified immunity grounds. *Id.*

This Court affirmed, concluding that "*Pickering* and *Garcetti* gave reasonable public officials fair warning that it violates the First Amendment to terminate a colleague in retaliation for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." *Id.* at 1334. The Court proceeded to analyze this Circuit's other First Amendment opinions, describing them as "examples" that constitute the "robust consensus" that *Pickering* and *Garcetti* gave "fair warning." *Id.* (analyzing *Akins*, 420 F.3d 1293; *Bryson*, 888 F.2d at 1566–67; *Walker v. Schwalbe*, 112 F.3d 1127 (11th Cir. 1997)). These opinions, along with *Carollo v. Boria* itself, were the same authorities the district court relied upon when it rejected the qualified immunity assertion. *See* App. 75 at 29–30.

In *Akins*, the plaintiffs were former employees of the purchasing department of a county in Georgia. The plaintiffs noticed "irregularities" in the "process for bidding and contracting" and exposed as much in a meeting with a public official. *Akins*, 420 F.3d at 1298. This Court reversed the order granting summary judgment on qualified immunity grounds. *Id.* at 1308. Citing *Pickering*, *Bryson*, and *Walker*, it held that a defendant had "fair warning . . . that speech whose main thrust is to

46

report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment." *Id.* at 1307–08.

In *Walker*, this Court affirmed the district court's denial of qualified immunity. 112 F.3d at 1133. The plaintiff was an employee of a state-funded social service provider who met with elected officials about "possible improprieties" at his job, including potential conflicts of interest. *Id.* at 1129. After his discussion with legislators, he was demoted and disciplined. *Id.* at 1130. This Court found that even "[a]t the time the defendants acted in 1991, clearly established law informed reasonable government officials that [the plaintiff] could not be punished for his First Amendment speech." *Id.* at 1133. In doing so, it relied again on *Pickering* and *Bryson*. *Id.*; *see also Bryson*, 888 F.2d at 1566.

The Commissioners can point to no factual or legal distinctions that would justify diverging from this Circuit's consensus. They instead comingle their "immunity prong" arguments with "merits prong" attacks. For example, the Commissioners claim they could not have had notice that Chief Acevedo's speech was protected, because Chief Acevedo was merely "reporting to his superiors that elected officials … interfered with his management" of the MPD. Brief at 43–44. They also claim that other cases stand for the proposition that First Amendment protection does not apply when "reporting was part of their jobs." *Id*. at 44.

47

In other words, the Commissioners continue to ignore Chief Acevedo's allegations of corruption, abuse of power, and targeting political enemies—deflecting attention to cases where the government whistleblowers "had no First Amendment Protection." Brief at 44–46. This addresses whether Chief Acevedo's speech was protected, not whether they had notice of a clearly established right. When Chief Acevedo's allegations are presumed true, there is no reasonable argument that they lacked fair notice that they could not terminate him for speaking about them. *Lane* explained the reasoning clearly: "It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute *corruption by public officials*—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim." 572 U.S. at 240–41 (emphasis added).

**C. The district court need not have weighed the allegations and inferences under a *Pickering* framework.**

The Commissioners complain that the district court "never analyzed qualified immunity using the *Pickering* framework." Brief at 46–47. At a high level, this is simply inaccurate. The district court wrote specifically on "Pickering Balancing" in determining whether Chief Acevedo's speech was protected, App. 75 at 21–24, and relied on the precedents above in finding that the Appellants had fair warning. *Id*. at 29–30. Those cases—including *Carollo*, *Akins*, *Bryson*, and *Walker*—all analyze and apply *Pickering*.

48

Instead, this appears to be another rehash of the Commissioners' argument that they should have won the *Pickering* test and rendered Chief Acevedo's speech unprotected. As discussed *supra*, at the motion to dismiss stage, the Commissioners cannot inject their interpretation of the allegations or dispute the alleged facts in order to tip the *Pickering* scales in their favor. *See Keating*, 598 F.3d at 762.

Moreover, Chief Acevedo carried his burden of pointing to a "broad statement of principle" in this Circuit clearly establishing that the Commissioners' conduct would violate his rights. *See Jarrard*, 115 F.4th at 1323–24. The Commissioners did not need notice of how the specific legal factors (such as *Pickering* balancing) would be applied. Rather, they need only have had notice that Chief Acevedo's speech was protected, and that reprimanding and terminating him would constitute adverse employment actions. *Akins*, 420 F.3d at 1307 (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002) for the principle that "the facts of previous cases need not be 'materially similar' to the facts at hand to furnish fair warning"). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances[,] a general constitutional rule already identified … may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope*, 526 U.S. at 741.

Indeed, since the issuance of the district court's order on July 29, 2024, this Court has spoken on this exact issue. In reversing the grant of summary judgment

49

and finding that a factual dispute existed as to whether the defendants were on notice, this Court noted, "we don't think that a qualified-immunity doctrine that even pretends to real-world relevance can turn on whether [defendants] had clear notice of a judge-created test called the '*Pickering* framework,' or its application" and therefore a defendant's awareness of how the *Pickering* framework may affect the legal analysis was not required for courts to find that there was fair warning. *Jarrard*, 115 F.4th at 1325. Accordingly, Chief Acevedo need not marshal cases where the defendants were on notice of the right to constitutionally protected speech *and* the impact of the *Pickering* factors that may be applied. It is sufficient to show, as he did *supra*, that his First Amendment right to speak was clearly established and that terminating him in retaliation violated that right.

## IV. Manager Noriega has no valid grounds to distinguish his defense from the Commissioners'.

Manager Noriega filed separately to make two distinctions that he contends merits reversal. First, he argues that he was not the final decisionmaker on Chief Acevedo's termination and therefore cannot be held liable. Second and relatedly, because he was not responsible for Chief Acevedo's humiliation and termination, Manager Noriega argues he had no fair notice that he would violate Chief Acevedo's First Amendment rights when he suspended him "with pay" and only "temporarily … pending an evidentiary hearing and determination by the Commission." *See*

50

Noriega Brief at 7–8. Neither of these distinctions is availing, and his arguments fail almost entirely for the same reasons the Commissioners' arguments do.

### A. Suspension constitutes an adverse employment action.

Manager Noriega insists that he cannot be sued individually, because the City Charter does not authorize the city manager to terminate the police chief. Noriega Brief at 7. This argument conflates the two distinct events of suspension and termination. Indeed, Manager Noriega concedes that the City Charter authorized him, *solely*, to suspend Chief Acevedo. Noriega Brief at 7. This concession necessarily follows the language of Section 26 of the City Charter, which provides that, "The city manager shall have the exclusive right to suspend the chief of police…."

There is no dispute then that Manager Noriega was the final decisionmaker on at least the decision to suspend Chief Acevedo. Chief Acevedo alleged that it was Manager Noriega—not the Commissioners—who suspended him and provided the pretextual Suspension Letter. App. 1 ¶¶ 212–214. Chief Acevedo further alleged that his suspension was one of the adverse employment actions that he suffered as a result of his whistleblowing. *Id.* ¶¶ 214, 281–286. Manager Noriega cannot avoid liability simply because he was not the final decisionmaker in every adverse action that Chief Acevedo pleaded. One was enough.

Nevertheless, Manager Noriega appears to argue that the temporary suspension with pay did not affect an "important condition" of Chief Acevedo's employment such that it would "be considered an adverse employment action in a First Amendment retaliation case." *Akins*, 420 F.3d at 1300 (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004), *cert. denied,* 544 U.S. 976 (2005)). He is wrong, and this Circuit has soundly resolved this issue: "We have decided that, as a matter of law, important conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands." *Id.* So long as the employer's conduct "'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee,' [it] qualifies as an adverse employment action." *Id.* (quoting *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 587 (11th Cir. 2000)). Even further, this Court has stated that the list of actionable employment events that it has previously articulated is *not* exhaustive: "Importantly, 'we have never held that the list cannot be expanded, so long as the action impacts an important condition of employment.' Therefore, we are not prevented from *recognizing additional adverse employment actions*.'" *Id.* at 1301 (quoting *Stavropoulos*, 361 F.3d at 620) (emphasis added).

"In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively." *Id*. For example, in *Wideman v.*

52

*Wal-Mart Stores, Inc.*, this Court found that even a one-day suspension could give rise to an adverse employment action, when the employee was also subjected to written reprimands, falsely accused of not showing up for work, and made to wait for authorization to receive medical treatment. 141 F.3d 1453, 1455 (11th Cir. 1998); *see also Akins*, 420 F.3d at 1302 (analyzing *Wideman*).

Put simply, Manager Noriega urges the Court to isolate the length of the suspension or its monetary cost alone. But that framework is incorrect, and the overarching inquiry is whether "the alleged employment action would likely chill the exercise of constitutionally protected speech." *Id.* at 1300 (citing *Stavropoulos*, 361 F.3d at 618). In fact, the only authority Manager Noriega cites in support of his proposition affirms the principle in *Akins* and *Stavropoulos*. *See Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021) (the "common element" in determining whether an action is adverse is "whether the challenged conduct would, objectively, chill or deter the exercise of constitutionally protected speech"). In applying this principle, the *Bell* court determined that it could decide the case "narrowly on the complaint before" it. *Id*. It therefore rejected the purported bright-line principle that Manager Noriega seeks to impose on Chief Acevedo: "We *need not issue a broad ruling* about whether a public employee's suspension with pay always constitutes or never constitutes an adverse action for purposes of a First Amendment retaliation claim." *Id.* (emphasis added).

53

**B. Manager Noriega's alleged actions would chill or deter a reasonable person from exercising the right to speak**.

The overall context surrounding his suspension demonstrates that Manager Noriega's rose to the level of an adverse employment action. Specifically, Chief Acevedo voiced his concerns to Manager Noriega multiple times, in June and September 2021. App. 1 ¶¶ 124–25, 143, 168. Manager Noriega's reaction was indifferent, at best. He told Chief Acevedo that the Commissioners' "behavior was part of doing business in the City of Miami." *Id.* ¶ 169. Additionally, on September 23, 2021, in a manifest act of complicity, Manager Noriega "ordered Chief Acevedo not to transfer Officer Blanco" because doing so would anger Commissioner Carollo and trigger his retaliation against the MPD's budget. *Id.* ¶ 173. Chief Acevedo wrote and circulated the Memorandum the next day. *Id.* ¶¶ 174–182.

Upon receiving the Memorandum, Manager Noriega called Chief Acevedo and said, "So you've gone after them, and better be sure you have a kill shot because if you don't, you better not take it. Maybe it's because you're an outsider it's easier for you. Trust me, I came from my last job where I had a hell of a lot more autonomy than I have here, but I realize and accept my limitations." *Id.* ¶ 186. Nothing about that alleged statement passes as a policy debate; it was a warning of what consequences were to come as a result of the Memorandum.

Manager Noriega suspended him on October 11, 2021, producing a Suspension Letter full of pretextual grounds. *Id.* ¶ 212. Chief Acevedo alleged that,

54

in reality, Manager Noriega suspended him because the Commissioners were putting "pressure" on Manager Noriega to silence or punish him. *Id*. ¶¶ 213–15. Manager Noriega admitted as much when he told Chief Acevedo that he "had to stop the bleeding" and that Chief Acevedo had "gone too far" when he wrote the Memorandum. *Id*. ¶ 216. To compound the harm, at the October 14, 2021 hearing, Manager Noriega's counsel put on evidence for the purported "cause" of his decision to suspend Chief Acevedo. *Id*. ¶¶ 219–20. Manager Noriega himself testified in support of suspending and terminating Chief Acevedo. *Id*. Ultimately, the Commissioners voted to make the suspension a permanent termination. *Id*. ¶¶ 221–26.

Taking these allegations together, there is no doubt that the aggregated circumstances give rise to an adverse employment action, because it would "chill the exercise of constitutionally protected speech" for a reasonable government employee. *Bell*, 6 F.4th at 1377 (quoting *Stavropoulos*, 361 F.3d at 618). Chief Acevedo's whistleblowing was penalized by suspension, pretextual accusations of misconduct in the Suspension Letter, and Manager Noriega's complicity at the termination hearing. Reasonable government employees in those circumstances would hesitate to act as Chief Acevedo did, if they were not protected by the First Amendment.

55

### C. Manager Noriega had notice and fair warning that his actions would violate Chief Acevedo's First Amendment rights.

Next, Manager Noriega argues that he was entitled to dismissal on qualified immunity grounds, because no precedent gave "fair warning" that accounted for the distinction that he merely suspended Chief Acevedo, and that the suspension was "with pay" and temporary pending the Commission's hearing. For the reasons set forth above, these distinctions are not legally meaningful, as there can be no doubt that Manager Noriega's actions on the whole would chill the exercise of protected speech.

The district court relied on multiple precedents from this Circuit that recognized that actions less severe than termination could be sufficient to constitute an adverse employment action. *See* App. 75 at 27–30. That authority included *Akins* itself, as well as *Walker v. Schwalbe*, where the employee was demoted and faced a salary reduction in retaliation for complaining to the legislature about budget "improprieties." 112 F.3d at 1129–30. The district court need not have "parse[d] out whether any of [these] cases involved indistinguishable facts or circumstances" before determining that Manager Noriega had fair warning that his actions would violate Chief Acevedo's rights. *Jarrard*, 115 F.4th at 1324.

Moreover, Manager Noriega relies on abrogated authority to support the proposition that employers are "rarely ever on notice" their actions would violate the First Amendment unless the plaintiff produces an identical precedent. Noriega Brief

56

at 7 (quoting *Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998)); *but see Akins*, 420 F.3d at 1307 ("*Martin*'s statements regarding the qualified immunity standard are not binding because the case was decided before *Hope v. Pelzer*. … Following *Hope*'s instructions, we find that [the employer] was at least on notice of *Pickering* and *Connick*, which set forth the standard for protection of the speech of public employees."). Again, Chief Acevedo need not have proven that every nuance of Manager Noriega's method of retaliation had been the subject of past precedent. *See Jarrard*, 115 F.4th at 1324. All he needed to show, which he did, was that the Commissioners and Manager Noriega alike had fair warning that clearly established law prohibited retaliation against public employees who blow the whistle on corruption. Accordingly, Chief Acevedo carried this burden to defeat Manager Noriega's qualified immunity defense, as well.

## V. The Commissioners are not entitled to dismissal on legislative immunity grounds.

Legislative immunity does not protect the Commissioners, because "[a]bsolute legislative immunity extends only to actions taken within the sphere of legitimate legislative activity." *Brown v. Crawford Cnty., Ga.*, 960 F.2d 1002, 1011 (11th Cir. 1992) (internal quotation marks omitted). "[I]t is the official function that determines the degree of immunity required, not the status of the acting officer." *Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 829 (11th Cir. 1982). "A legislative

57

act involves policy-making rather than mere administrative application of existing policies." *Crymes v. DeKalb Cnty., Ga.*, 923 F.2d 1482, 1485 (11th Cir. 1991).

In contrast, "if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Crymes*, 923 F.2d at 1485. "[E]mployment and personnel decisions are administrative in nature and do not involve the deliberative legislative processes encouraged and protected by the legislative immunity doctrine." *Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir. 1995) (collecting cases for the principle that terminating specific individuals are "managerial" and not legislative in nature).

Though the Commissioners excerpt snippets of allegations that relate to certain Commission meetings, Chief Acevedo's lawsuit does not assert a violation of First Amendment rights over, for example, the mere passage of the Resolution. Brief at 54–55. Rather, Chief Acevedo sued over the adverse employment actions directed at him in retaliation for his speech. The acts taken to humiliate him, suspend him, and terminate him were specifically directed at him. *E.g.*, they played videos of him fundraising in an Elvis costume to disparage *him*, not police chiefs generally. App. 1 ¶¶ 195–96. The Commissioners also voted to terminate Chief Acevedo, not eliminate funding for the role of Chief of Police. Indeed, Chief Acevedo alleges that the Commissioners hand-picked his successor "because he carries out their orders without question and allows the Defendant Commissioners to abuse MPD resources

58

to carry out personal agendas and vendettas." *Id.* ¶ 75. The Commissioners played the theme music from The Godfather at the new chief's swearing-in ceremony, and Commissioner Diaz de la Portilla hugged him to congratulate him. *Id.* ¶¶ 76–79.

There can be no plausible inferences drawn from the Complaint that the Commissioners' retaliatory actions were legitimate legislative business. They were targeted acts at a single individual, and so their claim for legislative immunity must be rejected.

## CONCLUSION

For the reasons set forth above, Chief Acevedo asks this court to affirm the district court's order.

59

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(a) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,970 words.

Respectfully submitted,

*/s/Marcos Daniel Jiménez*
Marcos Daniel Jiménez
 Florida Bar No.: 441503
Cristina Moreno
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Email: mdj@leoncosgrove.com
Email: cmoreno@leoncosgrove.com

Heaven Chee
Sam T. Linn
**LEÓN COSGROVE JIMÉNEZ, LLP**
700 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: (346) 250-5664
Email: hchee@leoncosgrove.com
Email: slinn@leoncosgrove.com

*Counsel for Appellee*

60

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on July 1, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or parties of interest via either transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

*/s/Marcos Daniel Jiménez*
Marcos Daniel Jiménez
 Florida Bar No.: 441503
Cristina Moreno
**LEÓN COSGROVE JIMÉNEZ, LLP**
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: 305.740.1975
Email: mdj@leoncosgrove.com
Email:  cmoreno@leoncosgrove.com

Heaven Chee
Sam T. Linn
**LEÓN COSGROVE JIMÉNEZ, LLP**
700 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: (346) 250-5664
Email:  hchee@leoncosgrove.com
Email:  slinn@leoncosgrove.com

*Counsel for Appellee*

61